## THE SEQUESTRATION CASES.

---

### E. LUTER v. WILLIAM L. HUNTER.

The first sections of the acts of 7th of December, 1861, 2d December, 1863, and 16th December, 1863, substantially read as follows: "Until twelve months after the ratification of a treaty of peace between the Confederate States of America and the United States of America, or until otherwise provided by law, all laws for the collection of debts and liabilities on bonds, promissory notes, bills of exchange, and contracts for the payment of money, except in cases of persons who abandon the country; liabilities on the part of public officers; liabilities and indebtedness to the state; and also when money has

been received on deposit, or in trust for those who may be entitled to the same, and for the collection of the interest on the money loaned at interest by guardians, belonging to their wards, are hereby suspended: *Provided,* That this act shall not be construed to forbid the issuance of writs of attachment, sequestration, or injunction nor the institution of necessary preliminary proceedings for that purpose, in accordance with existing laws: *And provided further,* That this act shall not apply to any claim or demand against alien enemies: *And provided further,* That this act shall not be so construed as to interfere with the action of the Supreme Court in deciding all cases as now directed by law." (Paschal's Dig., Arts. 5140, 5125, Note 1124.) This act was unconstitutional.

The 10th section of the 1st article of the constitution of the United States, among other inhibitions, declares that no state shall pass any law impairing the obligations of contracts. (Paschal's Annot. Const., Notes 157 to 161.)

That class of cases which denies that the remedy forms any part of the contract, and that therefore it may be expanded, contracted, or entirely abrogated without constitutional question, held not to be sound reasoning.

The constitution does not mean contracts determinable in the forum of conscience, but legal contracts; and the inhibition was intended to prevent any legislation to change their legal character and effect under the laws when made.

A legal contract means such as can be enforced by law, and if there be no remedy for its enforcement, it is in no proper sense a legal obligation; and hence when the remedy has been destroyed, or greatly delayed by legislation, having no other object than to benefit the obligor, by relieving him, during the suspension of the remedy, from the performance of his contract, it is, during that time, impaired.

A contract is an agreement, in which a party undertakes to do, or not to do, a particular thing, as in the case of a promissory note, and any law which releases a part of this obligation must, in a literal sense, impair it.

A statute passed subsequently to the execution of a mortgage, and which prevents any sale unless two-thirds of the amount at which the property is appraised is bid, impairs the obligation of the contract.

Every act of the state of Texas, from the inception to the close of the rebellion, which was in hostility to the United States, or in disregard, or in conflict with its constitution, is an absolute nullity.

No single right was gained by the insurgent states; on the other hand, by the laws of war, they lost all, except such rights under the law of nations as appertained to a conquered people.

The rights of Texas to civil government during the period of war against the national government are not denied; only the acts to aid in the establishment of a new and hostile government.

The states composing the confederacy occupy a higher ground than the confederate government. The state governments, in their origin, were peaceful, legitimate, and constitutional, and they continued to exist notwithstanding

XXX—44

the rebellion, without a hiatus or interregnum. In the exercise of such powers as had·previously appertained to them under the constitution of the United States; whereas the confederate government was conceived in rebellion, and owed its being to, and existed while it lived, by revolution, force, and violence, against constituted authority; and it could perform no act, nor exercise any authority, without being in criminal contumacy of the constitution and government of the United States.

The United States has not interfered with the mere civil laws of the states in rebellion, whether enacted before or during the war, except as to such laws as necessarily result from the war, and such as were unconstitutional, or in hostility to the United States.

Congress, by the reconstruction laws, permits the state governments to continue, and their laws, so far as not unconstitutional, to be administered.

This court cannot be brought to believe that all legislation, of whatever character, by the states engaged in the rebellion, is void *ab initio*. But all such acts of the state, passed during the rebellion, as were intended, directly or indirectly, to aid the rebellion, are absolute nullities, and can never be invoked in support of any right claimed thereunder, or for the protection of those acting under them who have inflicted injuries upon others.

The stay law was repugnant to the constitution of the United States. It was also repugnant to the 14th section of the 1st article of the constitution of 1845, which reads as follows: "No bill of attainder, *ex post facto* law, retroactive law, or any law impairing the obligation of contracts shall be made, and no person's property shall be taken or applied to·public use, without adequate compensation being made, unless by the consent of such person." (Paschal's Dig., p. 49, sec. 14, Notes 168, 51, 157.)

These stay laws were, in their terms about "alien enemies," &c., and in their spirit and intention, designed to aid the rebellion, and were therefore not only unconstitutional, but null and void.

But the sections in these same acts, which suspend the acts of limitation, and make no discrimination, are upheld as valid. (Paschal's Dig., Arts. 4630, 4631.)

In the absence of such statutes, the court would have held that the war arrested the running of the statute.

The compulsory payment of a debt to a Confederate States receiver, under a process of garnishment and a decree of the district court of the Confederate States of America, is no bar to the recovery of the debt.

The United States has never acknowledged that any of its citizens were alien enemies to each other during the rebellion.

APPEAL from Goliad. The case was tried before Hon. E. P. UPTON, one of the district judges.

War ·was the inevitable result of secession. With the latter commenced actual hostilities. These culminated in

the attack upon Fort Sumter, and were soon followed by a formal declaration of war by the confederate congress against all the free states, and such citizens in Maryland and the other border states and the territories as should prove hostile to their cause. (Act May 6, 1861, p. 190.) As one of the fruits of this war, all persons in the United States residing out of the jurisdiction of what was claimed to be the Confederate States, as enlarged by practical secession, were treated as alien enemies, and to them the laws of war were applied.

The 1st section of the act of the confederate congress of 30th August, 1861, "for the sequestration of the estates, property, and effects of alien enemies," &c., declares all such property, rights and credits within these Confederate States, and every interest therein, held, owned, possessed, and enjoyed by or for any alien enemy since the 31st day of May, 1861, &c., to be sequestrated by the Confederate States of America. (Stats. at Large, Sess. III, ch. 61, p. 201.) The act provided for the appointment of receivers by the courts, and made it the duty of all citizens to discover and surrender such property. (Stats. at Large, §§ 2, 3, 4, 5, pp. 201, 202.) The 6th section provides the mode of proceeding for the forcible collection of the interest on all debts, and of the principal, upon certain contingencies, and for orders of sale in certain cases. The 12th section provides, "that the court having jurisdiction of the matter shall, whenever sufficient cause is shown therefor, direct the sale of any personal property, other than slaves, sequestered under this act, on such terms as to it shall seem best, and such sale shall pass the title of the person as whose the same has been sequestered." (Stats. at Large, p. 205, § 12.)

The 8th section provided for proceeding against debtors by garnishment; for the rendition of judgments to the extent of the discoveries, and that "the decree or judgment of the court, rendered in conformity to this act, shall forever

protect the garnishee in respect to the matter involved."
(Stats. at Large, p. 204.)

Under these laws Judge THOMAS J. DEVINE, the judge
of the confederate states court for the western district of
Texas, at Austin, appointed a number of most industrious
receivers, who proceeded to collect, as rapidly as possible,
all moneys owing to northern people, or "alien enemies."
Such was the law. The further history of this case is set
out in the opinion of the justice.

No briefs have been furnished the *Reporter*.

HAMILTON, J.—This suit was commenced by the appel-
lee before a justice of the peace for Goliad county, to re-
cover of the appellant the principal and interest of a note
due on the 19th March, 1861, for $100. On the 2d Octo-
ber, 1865, he obtained judgment, from which the appellant
prosecuted *certiorari;* and in his petition for the writ sets
forth in substance the following facts and reasons for its
issuance, to wit: After stating the fact of the rendition of
the judgment, he complains that it was wrong, unjust, and
contrary to law, because he says that upon the trial it was
proved that the note sued on was, in the spring of 1861,
left with the agent of the plaintiff, appellee here; and that
afterwards said agent was served with a writ of garnish-
ment by the confederate court to answer what effects he
had in his hands belonging to the plaintiff, (appellee;) that
he answered, giving a list of property and effects of the
plaintiff, among which was the note sued on; and that the
said court pronounced a judgment of sequestration against
said property, including said note, and ordered the agent
of the plaintiff (appellee) to turn over to the receiver of the
confederate states said property and effects, which order
was obeyed, the receipt for which, from the receiver, was
exhibited on the trial; that subsequently he, the defendant,
(appellant,) was served with garnishment from the confed-

erate district court, to answer whether he was indebted to the plaintiff, (appellee,) and in what amount; that he answered, and judgment was rendered against him in the confederate district court for the western district of Texas for the principal and interest of said note, and that he paid the amount of the judgment to the receiver of the confederate states in confederate treasury notes, at their face value.

The petition further states, that upon the trial it was proved that he, the defendant, (appellant,) knew when he paid the amount in satisfaction of the judgment that it was for the benefit of the confederate sequestration fund; and the plaintiff (appellee) testified on oath that from the spring or summer of 1861 he was absent from the confederate states, and within the lines of the United States; that the military authorities forbid his return to the confederate states, and that he was afraid to return.

The petition for *certiorari* further states, that he, the defendant, (appellant,) plead in the justice's court the following defenses: 1st, the stay law; 2d, the statute of limitation of four years; and, 3d, payment to the confederate states government.

The case was heard in the district court for Goliad county, at the fall term, 1865, upon a motion to dismiss the *certiorari*, upon the ground that "the petition is insufficient and does not show equity on its face," and asks, in the event of dismissal, for a *procedendo* to the justice of the peace, directing him to execute his judgment. The motion was granted; the *certiorari* dismissed, and the judgment for costs in the district court rendered against the defendant, (the appellant here,) and a *procedendo* to the justice of the peace awarded, commanding him to carry into effect his said judgment, to which judgment of the district court the defendant, by his attorney, excepted, and gave notice of appeal.

The error assigned is the judgment of the court upon the motion of the appellee.

Thus it is, in a case having its origin in a justice's court,

we are brought face to face with three of the most important legal questions growing out of the late rebellion and war.

The stay law pleaded must of course be taken to mean the act of the legislature of the state of the 7th December, 1861, and the supplemental acts of the 10th January, 1862, and of the 2d and 16th December, 1863, for these were the only laws upon the subject in existence at the date of the trial below.   But one section of these enactments need be referred to, and that is the supplemental act of 1863, which was substituted for the 1st section of the original act of 1861.   It is as follows:

"SEC. 1. Until twelve months after the ratification of a treaty of peace between the Confederate States of America and the United States of America, or until otherwise provided by law, all laws for the collection of debts, and liabilities on bonds, promissory notes, bills of exchange, and contracts for the payment of money, except in cases of persons who abandon the country, liabilities on the part of public officers, liabilities and indebtedness to the state, and also when money has been received on deposit or in trust for those who may be entitled to the same, and for the collection of the interest on the money loaned at interest by guardians belonging to their wards, are hereby suspended: *Provided*, That this act shall not be construed to forbid the issuance of writs of attachment, sequestration, or injunction, nor the institution of necessary preliminary proceedings for that purpose, in accordance with existing laws: *And provided further*, That this act shall not apply to any claim or demand against alien enemies: *And provided further*, That this act shall not be so construed as to interfere with the action of the Supreme Court in deciding all cases, as now directed by law." (Paschal's Dig., Art. 5125.)

If this court were inclined to avoid a full and complete decision of this question, the means of doing so might be

found in the discrimination in the act against those who are styled "persons who abandon the country" and "alien enemies."

In regard to a later statute upon the same subject, the question here presented is one about which there seems to be at this time much sensitiveness felt throughout the state by both debtors and creditors, and it is but reasonable to suppose that their views and wishes differ as widely as their interests are adverse.

However this may be, it is the simple duty of this court, without reference to the delicacy of this question or the individual hardships which may result, in obedience to the high obligations we have assumed, to declare the law, and in the performance of this duty, without evasion, we propose to meet the entire question arising upon the act of 1863, and give it a definitive settlement upon principles which are believed to be well founded, both in reason and in law.

The general question, as to whether state laws of this character are repugnant to the constitution of the United States, has been the subject of adjudication in many of the states of the Union, and a great contrariety of judicial opinions expressed, and is, therefore, as presented here, not a new question, except in so far as the political attitude and condition of Texas, at the date of the enactment, may be supposed to vary or change it.

We will first consider the question without reference to the political status of the state at the time of the enactment, and then inquire whether its powers in this respect were enlarged, or in any manner changed or affected, by its political attitude towards the United States.

The question is to be settled with reference to the constitutionality of the law. If it is in conflict with the constitution of the United States or the constitution of the state, or both, it is void; otherwise it is to be maintained as valid and operative. In the decisions of the other states

of the Union, as well as in the Supreme Court of the United States, upon this question, the point of inquiry has generally been how far legislation can go in changing the remedy for the enforcement of a contract provided by law, existing at the time it was entered into, without impairing its obligation; or, to state it differently, whether the law existing at the time the contract was entered into for its enforcement against the obligor, in case he shall make default, enters into and makes a part and parcel of the contract to the extent that it cannot be so materially changed as greatly to prolong its application for the enforcement of the existing right without being in conflict with the 10th section of the first article of the constitution, which, among other things, declares that "no state shall" * * * "pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts," &c.

There is a class of decisions upon this question that deny that the remedy forms any part of the contract, and that therefore it may be expanded, contracted, or entirely abrogated without constitutional question. This view, we are constrained to say, is, in our opinion, not supported either by the experience and understanding of business men, nor by sound reason. If there is any case or class of cases (and there are many) in which the law will imply an agreement or undertaking in connection with a written obligation, but not expressed in the instrument, it is in obligations for the payment of money, implied always, and by universal consent, by all contracting parties under laws existing for the enforcement of the rights of the obligee, that if the obligor shall make default, he shall, at the pleasure of the obligee, be subjected to the coercive power of the law.

It is said the instrument (whatever it be, a bond or note) is the obligation. In common parlance it is called the obligation. It would be more accurate, however, to say it is the evidence of the obligation; but, without stickling for

or discussing nice distinctions, let the written instrument be considered the obligation. The question is, what character of obligation? Moral, undoubtedly, for the obligor is in good conscience bound to perform his contract if he can. But it is something more; it is a legal as well as moral obligation, made so by the existing law, which declares that, if default be made by the obligor, it will by its majesty and power compel him to answer in the proper judicial tribunal. The character of the instrument is stamped upon it by the law itself, and yet it is said that this legal character may be destroyed by the abrogation of the law which created it, or made worthless by its indefinite suspension, without impairing the obligation of the contract. This cannot be sound reasoning. The constitution of the United States, in the provision quoted, does not mean contracts determinable in the forum of conscience, for there was not the slightest danger of interference with these by state legislation. On the contrary, legal contracts were meant, and the inhibition was against legislation to change their legal character and effect under the laws existing when made.

We understand a legal contract to mean such a contract as can be enforced by law; and, therefore, if there be no remedy by law for its enforcement, it is in no proper sense a legal obligation; and hence, when the remedy has been destroyed, or greatly delayed by legislation having no other object in view than to benefit the obligor by relieving him, during the period of the suspension of the remedy, from the performance of his contract, it is most manifest that during that time it is disrobed of its legal character and vitality, and is therefore sadly impaired.

The common and popular argument in behalf of state legislation for staying the collection of debts is, that although the states are prohibited from impairing the obligation of contracts, they may at pleasure regulate the rem-

· edy.    To this proposition, properly understood, we are ready to yield a hearty assent.

None will seriously question the right of each of the states to change, alter, or amend the laws providing the mode and manner of dispensing justice in their respective judicial tribunals as they may deem best calculated to promote the ends of justice, and conduce to the public interests and convenience.  But if, under the power to regulate, it be assumed that the remedy can be changed, not for the purpose of making the administration of justice more certain, complete, and efficacious, but for the purpose of denying or withholding indefinitely, or for a considerable time, such remedies as existed for the enforcement of pre-existing contracts, with the sole purpose of relieving obligors, then we are constrained to dissent.

It may be freely admitted that, if in an effort to regulate the remedy in furtherance of the ends of justice, fairly made with this view, it should happen that some inconsiderable time has been lost to the creditor by a change, for example, in the time of holding the court in which his demand is actionable, no complaint would be heard if made; but to "regulate" is neither to willfully destroy, hinder, nor delay.

It would be unprofitable to attempt a review of the conflicting decisions upon this question, made by the various state courts, since by the constitution of the United States all questions arising thereunder are to be determined by the Supreme Court of the United States; and this being a question arising under the constitution, the Supreme Court have, in repeated decisions, spoken authoritatively and with emphasis in its determination; and this court would feel guilty of contumacy and insubordination in refusing to accept, as settled law, the solemn adjudications of that high tribunal upon any question arising under the constitution of the United States, although opposed to our preconceived

opinions; and therefore we bow the more cheerfully, if not the more readily, to its decision of this question, because it is in harmony with our own well-settled convictions.

As far back as 1819 the question was settled as to what was meant, in the constitution of the United States, by the term "impairing the obligation of contracts." The question arose upon an act of bankruptcy passed by the state of New York in 1811, by the terms and provisions of which a debtor was discharged from all his liabilities antecedent to the passage of the act. A creditor subsequently sued him upon one of these debts, and the debtor pleaded his discharge under the law of New York, to which there was a demurrer, and the question of the constitutionality of the law was thus raised. Chief Justice MARSHALL delivered the opinion of the court, in which he said:

"In discussing the question, whether a state is prohibited from passing such a law as this, our first inquiry is into the meaning of the words, in common use, what is the obligation of a contract, and what will impair it?

"It would seem difficult to substitute words more intelligible, or less liable to misconstruction, than those which are to be explained. A contract is an agreement, in which a party undertakes to do, or not to do, a particular thing. The law binds him to perform his undertaking, and this is of course the obligation of his contract. In the case at bar, the defendant has given his promissory note to pay the plaintiff a sum of money on or before a certain day.

"The contract binds him to pay that sum on that day, and this is its obligation. Any law which releases a part of this obligation must, in the literal sense of the word, impair it." (Sturgis v. Crowinshield, 1 Wheat., 196.)

In the case of Bronson v. Kenzie *et al.*, it was held, that "a state law passed subsequently to the execution of a mortgage, which declares that the equitable estate of the mortgagor shall not be extinguished for twelve months after a sale under a decree in chancery, and which pre-

vents any sale unless two-thirds of the amount at which the property has been valued by appraisers shall be bid therefor, is within the clause of the 10th section of the first article of the constitution of the United States, which prohibits a state from passing a law impairing the obligation of contracts." (1 How., 311; 24 How., 461.)

And in the case of McCracken v. Hayward, in which the preceding case in 1 Howard was reviewed and confirmed, it was held, that "a law of the state of Illinois, providing that a sale shall not be made of property levied on under execution, unless it will bring two-thirds of its valuation, according to the opinion of three householders, is unconstitutional and void." (2 How., 608; 15 How., 304.)

These decisions are upon statutes not distinguishable in principle from the acts we are considering, and are therefore deemed conclusive of the question.

So far the question has been considered as if, at the time of the passage of the acts, Texas had been in her proper relations to the national government. But because it seems to have been considered in some quarters that her revolutionary and hostile attitude to that government relieved her from obligation to obey, and from responsibility for not obeying her constitutional authority, we will very briefly consider this assumption.

The idea, if it be really entertained, most probably grows out of the claim, so constantly put forth for the confederate states, of *de facto* governments, upon the belief that the acts of such a government are as valid as those of governments *de jure*, and cannot be disregarded by the rightful sovereignty after final and complete overthrow by the suppression of the rebellion in which it had its origin.

This claim to the character of a *de facto* government, made for the confederacy, will be considered in disposing of the last point in the case, and the reasoning and authority presented upon that point will apply also, in its prominent features, to the same claim for Texas. It will at present

suffice to say, that every act of the state of Texas, from the inception to the close of the rebellion, in hostility to the United States, or in disregard of her constitution, and in conflict with it, or in aid of the rebellion, is an absolute nullity.   At the time of the passage of these laws, it is true, she was engaged, with other states, in a war with the United States, and she and the states engaged with her "combined," says Mr. Justice Grier, in the Prize Cases, "to form a new confederacy, claiming to be acknowledged as a sovereign state; " and adds: " Their right to do so is now (1862) being tried by wager of .battle." Every right claimed by the revolting states against the national government was put in issue and decided by the war; and it would seem to be a strange perversion of reason and of law to hold that by unsuccessful rebellion a state had acquired the right to do what it could not do while occupying peaceful and proper relations to the national government.   No single right was gained by the insurgent states.   On the other hand, by the laws of war, they lost all except such rights, under the public law of nations, as appertain to a conquered people.

There was not a moment of time during the existence of the war when the constitution of the United States did not assert its authority over the States in rebellion, and although the exercise of this authority was for a very considerable time obstructed and prevented by force in Texas, as it was elsewhere, yet when that force was broken down by force—when the final judgment of the great arbitrament of arms was pronounced—condemnation of every act, whether confederate or state, done or attempted in contravention of the constitution and government of the United States was its necessary and inevitable legal effect, for the issues joined included all, and the judgment was final upon all the issues.

This position is so obviously correct and so well sustained by authority which will be referred to in the con-

cluding part of this opinion, that it is considered unnecessary to press it further.   This does not deny to the people of Texas all right to civil government of any character during the period of her rebellion and war against the national government; it only condemns what was done by her to aid in the establishment of a new and hostile government.   The public law of nations does not deny to a people engaged in rebellion and civil war, however wrongful, against the rightful sovereignty, civil organization and administration.

In such a condition of society as is always superinduced by civil war, it would be not only absurd, but positively inhuman and atrocious, to deny to the insurgents and aggressors the right to civil organization, and the use of such means as can be provided by legislation, or otherwise, to prevent anarchy and the entire overthrow of society; and especially where, as in the South during the late war, millions of non-combatants—women and children—and their homes might otherwise have been at the mercy of desperate marauders.   This principle applies with more force to the states engaged in the rebellion than it would to a revolting portion of the people of a solid government, without subdivision into subordinate sovereignties, clothed with the power of local legislation in all matters not prohibited to them by the constitution of the supreme sovereignty.

In the one case, a government or civil organization would have to be created by usurpation and force, with assumed power to act, whereas in the other, local governments or subordinate sovereignties, with full and complete powers for the purposes of local legislation pre-existed, subject only to the inhibitions and limitations of the constitution of the United States.

In this respect, we think, without doubt, the states composing the confederacy occupy far higher ground than the confederate government.   Their governments were, in

their origin, peaceful, legitimate, and constitutional, and they continued to exist, notwithstanding the rebellion, without a *hiatus* or *interregnum*, in the exercise of such powers as had previously appertained to them under the constitution of the United States, together, it is true, with other assumed powers not warranted by it, and in utter disregard of and in hostility to the national government, whereas the confederate government was conceived in rebellion, and owed its being to, and existed while it lived by, revolution, force, and violence against constituted authority, and could perform no act, nor exercise any authority, without being of necessity in criminal contumacy of the constitution and government of the United States.   Its very existence was, therefore, while it lasted, a continuous offense and crime against the government.

Not so of the states, considered separately and simply as states; their origin being legitimate and their powers defined, they cannot, in any proper sense, be considered as existing by usurpation.

Their sin consisted in combining to organize and establish the confederate government, and by usurping for this purpose, or attempting to usurp, the sovereign power and authority of the United States by war and conquest; and for this they are undergoing an atoning process for the re-establishment of their former relations to that government.

It was neither usurpation of the rights and authority of the United States as they existed before the war, nor in contravention of any expressed policy during its existence, for the insurgent states to perform such acts of local legislation as are permitted to the states by the constitution of the United States.

The United States might doubtless, in the exercise of its powers as conqueror, have laid a destroying hand upon the entire civil structure of the states engaged in war against it, but having no motive to interfere in their civil

polity beyond such changes as will make their constitutions and laws conform to the events of the war, it has left untouched such of their laws, whether enacted before or during the war, as do not in any way conflict with its rights, powers, and declared policy. In questions like this, political in their character, though often the subject of judicial inquiry, the courts will follow the action of the political authorities. The congress of the United States has, so far, not thought it proper or expedient to touch this subject directly or explicitly, but in the original, and one of the supplemental acts, for the reconstruction of the governments of the states engaged in the rebellion, of the 2d of March and of the 19th July, 1867, while declaring the existing governments in those states are not "legal governments," they nevertheless permit them to continue in existence until new state governments can be ordained and established; and the only fair presumption is, that during their existence they were allowed and expected to be administered under such laws, not repugnant to the constitution and authority of the United States, as then existed upon their respective statute-books, unless condemned by their own courts. And so they have been and are being administered to-day in Texas, as in all the other of those states; otherwise this court would not now be in session. This may be regarded as a tacit acquiescence by the political authority of the United States, so far as it is concerned, in the general legislation of these states not tainted with rebellion or opposed to its constitution or settled public policy.

We cannot, therefore, be brought to believe that all legislation, of whatever character, by the states engaged in the rebellion during its existence is, as some insist, null and void *ab initio*.

It is repugnant to every principle of reason and sound policy, and to the modern usage and public law of nations, to hold that all municipal laws, without political significance,

enacted in this or any other of the confederate states, are to fall at a single blow, and with them all the innumerable rights which have grown up, and have been fairly acquired under them.    An act for the creation of a new county, or change in the boundary of a county; the re-organization of a judicial district, and change in the time of holding courts, and their solemn judgments rendered after such change; a new rule of practice or of pleading in our judicial system; a change in the estray or the tax laws; the creation of bodies corporate for the purposes of internal improvement, manufacturing, education, and for religious purposes, together with a vast variety of others that might be mentioned—all are to be doomed, together with all rights which have been acquired under them, according to these extreme views.    Fortunately the law, we think, tolerates no such unreasonable and pernicious doctrine.    The cruel injuries inflicted upon society by civil war cannot be thus healed, and if it were possible to have the principle adopted and the policy carried into effect, it would prove more disastrous to the rights of citizens and to the peace of society and public order, than the late war; it would be "confusion worse confounded."    Such laws are not void, and such rights as have been fairly acquired under them will be upheld and protected, though the laws may be hereafter repealed or otherwise abrogated.

On the other hand, (we repeat,) all such acts of the state, passed during the rebellion, as are repugnant to the Constitution of the United States, or were intended, directly or indirectly, to aid the rebellion, are absolute nullities, and can never be invoked in support of any right claimed thereunder, or for the protection of those who, acting under them, have inflicted injuries upon others.

This digression has been indulged in, because it is german to the question under consideration, and because also of the various and widely divergent views upon the subject which seem to have obtained in the public mind, and with

the purpose and hope that an expression of our convictions might contribute in some measure to a more full comprehension and appreciation of the subject.

We have said that the laws of 1861, 1862, and 1863, to stay the collection of debts, were repugnant to the Constitution of the United States, and that the state of Texas, by her rebellion, acquired no immunity for its violation.

But if she had been free from all obligation to the national Government, her own constitution would fatally condemn the laws in question.

The 14th section of the 1st article of that instrument reads as follows: "No bill of attainder, *ex post facto* law, retroactive law, or law impairing the obligation of contracts, shall be made," &c., &c.; almost identical in terms with the 10th section of the 1st article of the constitution of the United States, and precisely the same with respect to the inhibition to "pass any law impairing the obligation of contracts." It seems, however, that our state legislatures of that memorable period were not to be balked in the accomplishment of any revolutionary purpose by constitutional restrictions, whether imposed by their own or the national constitution. But if these constitutional difficulties did not exist, there is still another and sufficient reareason for the condemnation of these laws.

It is apparent, both from the public history of the times and from intrinsic evidence contained in the acts themselves, that the object of their enactment was partly, if not entirely, to aid the then existing rebellion. This is clearly evidenced by the exception against "alien enemies," and "persons who abandon the country." We are not permitted to affect ignorance of who were meant by these descriptive classes, which included a large majority of the citizens of the United States, all of the citizens of the loyal states, and such loyal citizens of Texas as were compelled to abandon their homes on account of their fidelity to the national government.

The acts were, in spirit and purpose, contrary to public policy, in aid of the rebellion, and were and are, therefore, void.

The question of the statute of limitation of four years, which was pleaded by the appellant, is disposed of by reference to the acts of the 13th January, 1862, and 20th February, 1863, (Paschal's Dig., Arts. 4630, 4631,) the last of which is as follows: "All statutes of limitation on all civil rights of action of every kind, whether real or personal, are hereby suspended until one year after the close of the war between the Confederate States and the United States," &c.  In this act there is no effort to exclude from its benefits any class or description of persons, and, it being upon a subject not prohibited to state legislation, cannot certainly be resisted by one claiming the benefits of the previous law suspending all remedies for the collection of debts, for the bane of which it was obviously intended as a partial antidote.

But, in the absence of any such law, we would not have hesitated in declaring that the existence of the war prevented the running of the statute of limitations generally, and most certainly in the case at bar.

The remaining question is as to the plea of payment of the note sued on by the appellant to the Confederate government, and in its determination we are happily relieved from all labor in its discussion by an opinion of controlling authority on the precise point.

Mr. Chief Justice CHASE, in the United States circuit court over which he presides, delivered an opinion in said court, sitting in North Carolina, during the past year, in a case resting exclusively upon this question of the validity of the plea of forced payment of a debt by the debtor to the Confederate government.  We quote largely from the opinion, in order that the case itself, and the reasons and points upon which the opinion is rested, may be fully understood.

The opinion proceeds:

"This is an action for the recovery of the amount of a promissory note with interest. There is no question of the liability of the defendant to the demand of the plaintiffs, unless he is excused by coerced payment of the note sued upon under an act of the self-styled Confederate congress, passed August 30, 1861, entitled 'an act for the sequestration of the estates of alien enemies,' and an amendatory act, passed February 15, 1862.

"It is admitted that the plaintiffs were citizens of Pennsylvania; that the defendant was a citizen of North Carolina; that the note sued upon was made by the defendant to the plaintiffs; and that the defendant was compelled, by proceedings instituted in the courts of the so-called Confederate States, to pay the amount due upon it to the receiver appointed under the sequestration acts.

"Upon these facts, it is insisted that the defendant is discharged from his liabilities to the plaintiffs. It is claimed that while it existed, the Confederate government was a *de facto* government; that the citizens of the states who did not recognize its authority were aliens, and, in time of war, alien enemies; that consequently the acts of sequestration were valid acts; and, therefore, that payment to a Confederate agent of debts due to such citizens, if compelled by proceedings under those acts, relieved the debtors from all obligations to the original creditors.

"To maintain these propositions, the counsel for the defendant rely upon the decisions of the Supreme Court of the United States to the effect, that the late rebellion was a civil war, in the prosecution of which belligerent rights were exercised by the national government and accorded to the armed forces of the rebel confederacy; and upon the decisions of the state courts during and after the close of the American war for independence, which affirmed the validity of confiscation and sequestration decreed against

the property of non-resident British subjects, and the inhabitants of colonies or states hostile to the united colonies or United States.

"But these decisions do not, in our judgment, sustain the propositions in support of which they are cited.

"The national constitution declares that 'treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort.'

"It has been supposed, and by some strenuously maintained, that the North Carolina ordinance of 1861, which purported to repeal the North Carolina ordinance of 1789, by which the constitution of the United States was ratified, and to repeal also all subsequent acts by which the assent of North Carolina was given to amendments of the constitution, did, in fact, repeal that ordinance and those acts, and thereby absolved the people of the state from all obligation as citizens of the United States, and made it impossible to commit treason by levying war against the national government.

"No elaborate discussion of the theoretical question thus presented seems now to be necessary. That question, as a practical one, is at rest, and is not likely to be revived. It is enough to say here that, in our judgment, the answer which it has received from events is that which the soundest construction of the constitution warrants and requires.

"Nor can we agree with some persons, distinguished by abilities and virtues, who insist that when rebellion attains the proportions and assumes the character of civil war it is purged of its treasonable character, and can only be punished by the defeat of its armies, the disappointment of its hopes, and the calamities incident to unsuccessful war.

"Courts have no policy; they can only declare the law.

"On what sound principles, then, can we say judicially that the levying of war ceases to be treason when the war becomes formidable? That, though war levied by ten men

or ten hundred men is certainly treason, it is no longer such when levied by ten thousand or ten hundred thousand? That the armed attempts of a few, attended by no serious danger to the Union, and suppressed by slight exertions of the public force, come unquestionably within the constitutional definition; but attempts at a vast combination, controlling several states, putting great armies in the field, menacing with imminent peril the very life of the Republic, and demanding immense efforts and immense expenditures of treasure and blood for their defeat and suppression, swell beyond the boundaries of the definition, and become innocent in the proportion of their enormity?

"In modern times it is the usual practice of civilized governments, attacked by organized and formidable rebellion, to exercise and concede belligerent rights. Instead of punishing rebels, when made prisoners in war, as criminals, they agree on cartels for exchange, and make other mutually beneficial arrangements; and, instead of insisting upon offensive terms and designations in intercourse with the civil or military chiefs, treat them, as far as possible, without surrender of essential principles, like foreign foes engaged in regular warfare.

"But these are concessions made by the legislative and executive departments of government in the exercise of political discretion and in the interest of humanity, to mitigate vindictive passions inflamed by civil conflicts, and prevent the frightful evils of mutual reprisals and retaliations. They establish no rights except during the war.

"It is true that when the war ceases and the authority of the regular government is fully re-established, the penalties of violated law are seldom inflicted upon the many.

"These principles, common to all civilized nations, are those which regulated the action of the government of the United States during the war of the rebellion, and have regulated its action since rebellion laid down its arms.

"In some respects the forbearance and liberality of the nation exceeded all example. While hostilities were yet flagrant, one act of congress practically abolished the death penalty for treason subsequently committed; and another provided a mode by which citizens of rebel states, maintaining a loyal adhesion to the Union, could recover, after the war, the value of their captured or abandoned property.

"The national government has steadily sought to facilitate restoration, with adequate guarantees of union, order, and equal rights.

"On no occasion, however, and by no act, have the United States ever renounced their constitutional jurisdiction over the whole territory, or over all the citizens of the republic, or conceded to citizens in arms against their country the character of alien enemies, or to their pretended government the character of a *de facto* government.

"In the prize cases, the Supreme Court simply asserted the right of the United States to treat the insurgents as belligerents, and to claim from foreign nations the performance of neutral duties, under the penalties known to international law. The decisions recognized, also, the fact of the exercise and concession of belligerent rights, and affirmed, as a necessary consequence, the proposition that during the war all the inhabitants of the country controlled by the rebellion, and all the inhabitants of the country loyal to the Union, were enemies, reciprocally, each of the other. But there is nothing in that opinion which gives countenance to the doctrine which counsel endeavor to deduce from it, that the insurgent states, by the act of the rebellion and by levying war against the nation, became foreign states and their inhabitants alien enemies.

"This proposition being denied, it must result, that in compelling debtors to pay to receivers, for the support of the rebellion, debts due to any citizen of the United States,

the insurgent authorities committed illegal violence, by which no obligation of debtors to creditors could be cancelled or in any respect effected.

"Those who engage in rebellion must expect the consequences. If they succeed, rebellion becomes revolution, and the new government will justify its founders. If they fail, all their acts hostile to the rightful government are violation of law, and originate no rights which can be recognized by the courts of the nation whose authority and existence have been alike assailed.

"We hold, therefore, that compulsory payment, under the sequestration acts, to the rebel receiver of the debt due to the plaintiffs from the defendant, was no discharge."

Nothing could be more conclusive to the mind of this court upon this question than the opinion quoted, on account both of its source and the irresistible force of the principles and reasoning by which it is sustained.

The positions are fully sustained by the most approved authorities upon international law and the public law of nations.

There is no error in the judgment of the court below, and it is

AFFIRMED.