HOUSTON AND GREAT NORTHERN RAILROAD COMPANY V. JACOB KUECHLER, COMMISSIONER OF THE GENERAL LAND OFFICE.

1. The Act of January 30th, 1854 (Paschal's Digest, Article 4945), provided that, "Any railroad company chartered by the Legislature of this State, "heretofore or hereafter, constructing within the limits of Texas a sec- "tion of twenty-five miles or more of railroad, shall be entitled to re- "ceive from the State a grant of sixteen sections of land for every mile "of road so constructed and put in running order;" and a supplemental Act of the same date (Article 4958) further provided that no road should "receive any donation under its charter, or under the Act to which this "is a supplement, for any work not done within ten years from the pas- "sage of this Act." *Held,* that these enactments, and the disposition of public land contemplated by them, were within the constitutional powers of the Legislature; and they were available not only to those companies already chartered at the date of the Acts, but also to any companies which should be chartered subsequently and while the Acts should remain in force. *Held further,* that the limitation of ten years, above quoted from the supplemental Act, was suspended by the subse- quent Acts of 1862, for the relief of railroad companies (Paschal's Di- gest, Articles 4961, 4965), so as to exclude, in the computation of the ten years, the time occupied by the late war between the United States and the so-called Confederate States; and therefore the above cited Acts of January 30th, 1854, were still in force on the 22d of October, 1866, when the Houston and Great Northern Railroad Company was chartered, and also on the 13th of November, 1866, when was approved "An Act "for the benefit of railroad companies," whereby the grant of lands to such companies was extended for ten years more.  (Ogden, J., dissenting.)

2. The Constitution of 1869, Article 12, Section 33, has declared the Legislature of 1866 to have been provisional only, and that "its acts are to be "respected only so far as they were not in violation of the Constitution "and laws of the United States ; or were not intended to reward those "who participated in the late rebellion, or to discriminate between citi- "zens on account of race or color, or to operate prejudicially to any class "of citizens." *Held*, that in the charter and franchises conferred by the Legislature of 1866 on the Houston and Great Northern Railroad Company, there is nothing obnoxious to these denunciations of the Constitution of 1869 ; and therefore the charter of the company, and the rights and franchises therein conferred, constituted a contract between the State of Texas and the incorporators ; and the 16th Section of the charter, providing that "the company shall be entitled to receive such "donations of land as are provided for the encouragement of internal "improvements by any general law of this State," entitles the company to the benefits of the Acts of January 30th, 1854, upon its compliance with the requirements of those Acts and of its charter. (Ogden, J. dissenting.)

3. The 12th Section of the Act of January 30th, 1854, requires that companies shall complete twenty-five miles of road within two years, &c. The Houston and Great Northern Company, though chartered in 1866, did not complete twenty-five miles of its road until September, 1871. But *held*, that in view of the force to be given to the Acts of 1862, above referred to, and by analogy to the constitutional provisions suspending the statutes of limitation, the time which elapsed between the 2d of March, 1867 (when the first of the reconstruction laws of Congress was enacted), and the 30th of March, 1870 (when the present State Constitution was accepted by Congress), is not to be computed ; wherefore the company did not forfeit its right to the land grant by reason of noncompliance with the requirements of the 12th Section of the Act of January 30th, 1854. (Ogden, J. dissenting.)

4. The 6th Section of the 10th Article of the Constitution of 1869 prohibits the grant of land and the issuance of land certificates, except to actual settlers, etc. *Held*, that this provision is prospective only, and does not affect rights to land acquired by railroad companies under previous laws. (Ogden, J. dissenting.)

5. The 7th Section, Article 10, of the Constitution of 1869 provides that, "All lands granted to railway companies, which have not been alienated "by said companies in conformity with the terms of their charters, re- "spectively, and the laws of the State under which the grants were "made, are hereby declared forfeited to the State for the benefit of the "School Fund." *Held*, that this provision cannot preclude the appellant from recovering land certificates to which it acquired a right under laws enacted prior to the adoption of the Constitution : Presiding Judge Evans deeming that this clause of the Constitution is applicable only

to lands which had been granted to railway companies previous to the adoption of the Constitution; while Mr. Justice Walker considers it repugnant to the 10th Section of Article 1 of the Constitution of the United States, which prohibits any State from passing any law impairing the validity of contracts. (Ogden, J. dissenting.)

6. *Mandamus* lies against the Commissioner of the General Land Office, at the suit of a railroad company, to enforce the issuance of land certificates to which the company had acquired a right under its charter and the general laws of the State. Under such circumstances, the Commissioner had no discretion to withhold or to refuse to issue the certificates.

7. See the opinion of Mr. Justice Ogden for the reasons of his dissent from the principal rulings made in this case.

APPEAL from Travis. Tried below before the Hon. J. P. Richardson.

The Houston and Great Northern Railroad Company was chartered by the Legislature of Texas on the 22d of October, 1866. The incorporators were T. M. Bagby, M. D. Ector, J. M. Maxey, M. H. Bonner, G. G. Gregg, C. G. Young, and fifteen other persons. The prescribed route of the road was to commence at Houston, and thence to proceed " northward to " Red River, connecting with the Memphis and El Paso rail- " road as near Clarksville as practicable, and passing as near to " the towns of Montgomery, Huntsville, Crockett, Rusk, and " Tyler, as cheapness of construction, practicability, and the " general advantages of the country will permit."

The capital stock of the company was limited to six millions of dollars, in shares of one hundred dollars each. By the 16th Section of the Act of incorporation it was provided that, " This " Company shall be entitled to receive such donations of land as " are provided for the encouragement of internal improvements, " by any general law of this State, upon the terms and condi- " tions in such law prescribed; provided, that the State donation " of lands, now provided for by law, shall not apply to such por- " tion of the road of said Company as shall be run parallel within " five miles of any road now in running order."

The company was organized at Houston, on Saturday, June

1st, 1867, by the election of C. G. Young, President, P. J. Willis, Treasurer, etc.

The opinions rendered in this case by the several members of this court will be found to disclose every fact of any significance, touching the legal questions involved in this litigation.

The arguments of the counsel on both sides were very able. They are not capable of condensation, and mere extracts from them would but mutilate them ; while space for an entire insertion of them cannot be afforded.

*Gray & Botts*, and *E. M. Pease*, for the appellant.

*William Alexander, Attorney-General*, for the appellee.

EVANS, P. J.    This suit was instituted by the Houston and Great Northern Railroad Company, in the District Court of Travis county, against the Commissioner of the Land Office, to compel him to issue to the company certificates for sixteen sections of land per mile, for twenty-five miles of constructed road.    The petition alleges that the Houston and Great Northern Railroad Company was incorporated by an Act of the Legislature, passed on the 22d day of October, 1866, and a copy of the charter or act of incorporation is made a part of the petition.    The petition further alleges, and the act of incorporation shows, that the 16th Section of the act of incorporation declares that " this company shall be entitled to receive such donations " of land as are provided for the encouragement of internal im- " provements by any general laws of this State, upon the terms " and conditions in such laws prescribed : provided, that the " State donation of lands now provided for by any law shall " not apply to such portions of the road of said company as " shall be run parallel, within five miles, of any road now in " running order."

The petition alleges that the organization of the company under the act of incorporation was completed on the 13th day of May, 1867 ; that notwithstanding the unsettled condition of

25

the country, the company expended large sums of money in the work of surveying, locating, and equipping its said road, during the year 1867, and until the time of filing this petition; that the company commenced the work of construction in March, 1870, and had constructed and put in running order a section of twenty-seven miles of road on the 8th day of September, 1871; and that no portion of said section of its road runs parallel, within five miles, of any other road.

The petition contains appropriate allegations of a compliance on the part of the company with the requirements of the general law relating to said roads; and alleges that upon the completion of the said section of twenty-seven miles of road, the company made a report of the fact to the Governor, on the 16th day of September, 1871, and that the Governor appointed an engineer to examine said section of road, and report as required by statute; that the engineer examined the constructed road and reported under oath to the Governor that said section of twenty-seven miles of road was constructed, completed, and put in running order in all respects as required by the company's charter and the laws of the State regulating said road; and that the report of the engineer was duly delivered to the defendant, the Commissioner of the Land Office.

The prayer of the petition is for a *mandamus* to the Commissioner, commanding him to issue to the said company four hundred and thirty-two certificates, for six hundred and forty acres of land each.

To this petition the Attorney-General answered as attorney for the Commissioner of the Land Office, denying the sufficiency in law of the facts set forth in the petition to entitle the said Railroad Company to the relief prayed for. The principal points of the demurrer are the following:

*First.* Because it does not appear from said petition that defendant can be compelled by *mandamus* to do any act or acts involving an exercise of official discretion on his part.

*Second.* Because it does not appear from said petition that the plaintiff has been incorporated by a Legislature of said

State, organized and acting under a State Constitution accepted by the Congress of the United States of America, or by a Legislature competent to make a donation of a part of the public domain of the State of Texas to a private corporation; but, on the contrary, it does appear from said petition that the plaintiff was only incorporated by the Legislature of a provisional government of said State, which had no power to create a private corporation, and to make it a grant of land.

*Third.* Because by Article 9 of the Constitution of said State, accepted by said Congress, and more particularly by Section 6 thereof, and by Article 10 of said Constitution, and more particularly by Section 7 thereof, it appears that the plaintiff has no cause of action.

*Fourth.* Because the school rights and privileges, secured by the Constitution of said State, last aforesaid, are guaranteed by an Act of said Congress, entitled, " An Act to admit the State " of Texas to representation in the Congress of the United " States," approved March 30th, 1871.

*Fifth.* Because it does not appear from said petition that the twenty-seven miles of railroad, alleged to be completed, were completed, or were even commenced, prior to the adoption and acceptance of the present State Constitution.

*Sixth.* Because the act of incorporation, under and by virtue of which the plaintiff claims to be incorporated, is not a contract ; said State not having under it, or by any law, the right to enforce a specific performance thereof, or to recover damages in case of a non-performance.

*Seventh.* Because no State Government of Texas ever had, or now has, the constitutional authority to make a gift to a private corporation.

From this statement of the pleadings the questions presented by the record may be distinctly seen.

The district judge sustained the demurrer; and the bill of exceptions shows that he did so because he was of opinion that the act of incorporation of the 22d of October, 1866, and the organization of the railroad company in accordance with its

terms, did not constitute a contract between the State and the company which entitled the company to lands for the construction of its road.

The case involves questions of transcendent interest, and the court has been unwilling to determine them without the most deliberate consideration—intensified by the fact that these questions depend, for their determination, not so much upon the authority of adjudicated cases as upon the just application of general principles of jurisprudence to the extraordinary condition in which the State and the people have been placed since the passage of the Ordinance of Secession in 1861.

We will consider these questions in what appears to us to be their proper order.

*First.* Does the petition show that the Houston and Great Northern Railroad Company has a right to sixteen sections of land out of the public domain of the State, for each mile of twenty-seven miles of constructed railway?

The Act of the 30th of January, 1854, entitled "An Act to "encourage the construction of railroads in Texas by donations "of land," provides by its first section that "Any railroad com-"pany chartered by the Legislature of this State, heretofore or "hereafter, constructing within the limits of Texas a section of "twenty-five or more miles of railroad, shall be entitled to re-"ceive from the State a grant of sixteen sections of land for "every mile of road so constructed, and put in running order."

We can entertain no doubt of the power of the Legislature of 1854 to make the disposition of the public land contemplated by the Act of 30th January of that year.

The importance of developing the natural resources of the State pressed cogently upon the consideration of the men of that day—men who had carried the State successfully through the period of its existence as a republic, into the American Union. Population and wealth were needed, and to secure these ends, a grand system of internal improvements was devised.

The great lines of railway from the Gulf coast to Red River,

and from the Eastern border to El Paso, and other important interior lines, were already projected. The subject was much discussed, and every mind turned to the public domain as the principal source from which aid to these enterprises was to come. It was never intimated at that day that the State lacked the power to make a donation out of the public lands, to aid in the construction of railroads; and the act of January 30th, 1854, and the subsequent act of 13th August, 1856, entitled " An Act to provide for the investment of the public school " fund in the bonds of the railroad companies," received the approval of men as competent to deal with such questions as any who have served Texas at any period of her history.

We cannot, therefore, give our assent to the proposition of the Attorney-General, that " no State government ever had the con- " stitutional authority to make a gift to a private corporation."

A careful examination of the act of January 30th, 1854, how- ever, convinces us that it never was intended to benefit the companies already chartered at the time of its passage, and not, as some have supposed, to extend the benefits indiscriminately to all companies that might be chartered during the time the act continued to be in force. This will appear from the lan- guage used in the 12th Section of the act, where it is said, that " no person or company shall receive any donation or benefit " under the provisions of this act, unless they shall construct " and complete at least twenty-five miles of the road contem- " plated by their charter, within two years after the passage " of this act." But it was unquestionably within the compe- tency of the Legislature, organized and acting under the authority. of the Constitution of 1845, by a special provision, to extend the benefits of this act to any railroad company chartered at any time while the act itself remained in force.

But was it competent for the Legislature which assembled in the City of Austin on the 6th day of August, 1866, to pass the act incorporating the Houston and Great Northern Railroad Company, and to extend the benefits of the act of 30th January, 1854, to the company so incorporated?

The answer involves the determination of another and pre-
liminary question ; and that question is : Was the act of Janu-
ary 30th, 1854, in force on the 22d day of October, 1866, or
had it expired by its own limitation ?   The last clause of the
12th Section of this act provides that " this act shall continue
" in force for the term of ten years, from the time it shall take
" effect, and no longer."   The act took effect on the 16th day
of April, 1854, and would have expired by its own limitation
on the 16th day of April, 1864, unless this period of limitation
was in fact either suspended in its operations by war, or the
time extended by intermediate legislation.   We are of opinion
that both the legislation of 1862 and the state of war had that
effect.   On the 11th day of January, 1862, the so-called Legis-.
lature of Texas passed an act entitled, " An Act for the relief
" of Railroad Companies," which prescribed that " the failure
" of any chartered railroad company in this State to complete
" any section, or fraction of a section, of its road, as required
" by the existing laws, shall not operate as a forfeiture of its
" charter, or of the lands to which said company would be en-
" titled under the provision of an act entitled, ' An Act to en-
" ' courage the construction of railroads in Texas, by donation
" ' of lands,' approved January 30th, 1854, and the several
" acts supplementary thereto ;  provided said company shall
" complete such section, or fraction of a section, as would
" entitle it to a donation of lands under existing laws, within
" two years after the close of the present war between the
" Confederate States and the United States of America."
    On the same day the Legislature passed another act
entitled, " An Act for the relief of companies incorporated
" for purposes of internal improvement, by allowing them
" further time for performance, on account of the pending
" war."

This act provided, that the time of the continuance of the
present war between the Confederate States and the United
States of America, " shall not be computed against any internal
" improvement company in reckoning the period allowed them

" in their charters, by any law, general or special, for the com-
" pletion of any work contracted by them to do," etc.

It is not our purpose to enter at length into the question of the power of the Legislature which sat in Texas from the 18th day of March, 1861, until the 6th day of August, 1866, to make laws binding upon the people. Four years and upwards of this time was a period of actual revolution. The government which held sway during those years was not a State government in the sense of the Constitution of the United States. It did not acknowledge that instrument as any part of the supreme law of the land. The several officers of the respective departments of that government bound their consciences by an oath to support a national authority which confronted the government of the United States on the field of actual battle.

But this government, nevertheless, did actually usurp and wield the political sovereignty of the State of Texas. Its Legislature enacted laws which the people of Texas were constrained by the demands of social order, and out of considerations for the well-being of society, to respect. When the armed resistance of those who had thus usurped power in Texas, to the government of the United States, ceased, and the revolutionary government reached its end by dissolution, the people of Texas attempted, under the protection of the military arm of the United States, to reorganize and reconstruct the State government, in accordance with the Constitution of 1845, as it was their clear, constitutional right to do.

The people of Texas, those who had not yielded allegiance to a foreign and hostile power, nor forfeited their rights of citizenship by acts of war, never for one moment of time ceased to be citizens of the United States, nor had their State ever for one moment ceased to be one of the States of the great American Union; and all their rights, which war had borne down and rendered dormant, revived in all their fullness and completeness, upon the return of peace. The national arm came not to destroy or impair, but to defend and protect those rights.

The problem presented to Texas when the revolutionary government was stricken down, was, how the people could restore lawful government, and regain the exercise of the political power which the revolutionists had usurped.

The appointment by the President of the United States of a Provisional Governor—the election of delegates to a State Convention—the assembling of that Convention in this city on the 7th of February, 1866—the revision of the Constitution—the election of State officers in June—the assembling of the Legislature on 6th August—the organization of the two Houses—the formal inauguration of the Governor elect—these were but successive incidents in the attempt at a reorganization of a State government. This attempt failed, not because of any lack of authority in the people of Texas to restore government, nor yet, as some have supposed, because of any interference by the Congress of the United States; for the interference of Congress was the result, not the cause, of the failure. The controlling participation in the movement of those who had renounced their national citizenship, and thereby placed themselves under political disabilities, was the sole cause of the failure; and when the Congress of the United States did interfere in the matter of restoring a State government in Texas, it was in aid of the second attempt, by the people not disqualified, to inaugurate a civil government.

A government, however, was instituted by the Convention of 1866, and its Legislature held a session in August of that year, and passed many laws, both general and special. This government the Congress of the United States declared to be provisional, and to be wanting in the attribute of legitimacy—meaning thereby that it was brought into existence by those who had not the capacity to exercise the powers of political sovereignty. But Congress never denied that this provisional government had the power to legislate, subject to the Constitution of the United States, and the paramount authority of Congress.

Now, to return to the point we were just considering, the

Legislature of 1866 found that the Convention had declared, in an act entitled " An ordinance making valid the laws and acts " of the officers therein mentioned, and for other purposes," that " all laws and parts of laws enacted by the Legislature in this " State since the 1st day of February, 1861, not in conflict with " the Constitution and Laws of the United States, nor with the " Constitution of this State as it existed from the 1st day of " February, 1861, and not in conflict with the Provisional Gov- " ernor's proclamation opening the courts, and authorizing the " institution of suits, are declared to be in full force as laws of " this State," etc.

This ordinance was a rule of action to the Legislature, and in obedience to it that Legislature was bound to treat the acts of the 11th of January, 1862, as in full force as a law of the State. But we hold that these acts, having been passed in due form by a body of men acting and recognized as a Legislature, and exercising authority as such over the people, are to be respected as rules securing rights to parties, until annulled by a superior and competent authority.

But we said that in our opinion both the legislation of 1862 and the condition of the country prevented the expiration of the act of January 30th, 1854, at the end of a term of ten years from the time it took effect. The act of 1854 contained a pledge of the public faith to railroad companies then possessing charters, that they should receive certain benefits for the constructing of the railways contemplated by their charters. Companies had gone to work in the just expectation that they would reap these benefits. This law and the law supplementary to it had all the sanctity of a contract between the State and these companies. Now it is a familiar principle of the law of contracts that if one party is prevented from fully performing his contract by the act of the other party, the party in fault cannot be allowed to take advantage of his own wrong, and screen himself from payment for what has been done under the contract. In the matter under consideration, the same principle finds application.

The State of Texas inaugurated a condition of war which rendered it physically impossible for the railroad companies which were at work in Texas at the time of secession, to construct the roads contemplated by their charters. The State ought not, upon principle, to be allowed to take advantage of her own wrong. Rights had grown up under the law of 1854. It could not, then, expire by its own limitation, during a state of war which made it impossible for the companies to secure its benefits.

We are brought, then, to the conclusion that the act of 30th of January, 1854, was still in force on the 22d day of October, 1866, and that the Legislature of 1866, although provisional, and wanting in the attribute of strict legality, did possess the power to pass the act incorporating the Houston and Great Northern Railroad Company, and to secure to that company the benefits of the act of the 30th of January, 1854; and it seems to us to be very clear, from the terms of the act of incorporation, and of the act of 13th of November, 1866, that this is what the Legislature meant to do.

But while the power of the Legislature of 1866 to pass these acts is admitted, it is not without qualification. The acts of that Legislature were all subject to reconsideration by the people, and to be accepted or rejected by them. When the people, therefore, exercised the right of final judgment upon this subject, as they did in the framing and ratification of the present Constitution, it was competent for them to approve and accept, or to condemn and reject, the acts of the Legislature of 1866, or any part of them.

Let it be granted that rights may have grown up under the acts of the Legislatures which sat during the period of the rebellion, which ought in equity and good conscience to be respected, it would yet be going too far to hold that when rebellion has been overcome, and a people enter upon the duty of restoring government, the acts of those who had pulled down government should be an insuperable obstacle to its restoration.

This was the view taken by the Congress of the United States. Congress claimed the constitutional authority to rescue the State government in Texas from those who had placed themselves in power in 1866, to the end that the citizens of the State might have an opportunity to exercise a deliberate, final judgment upon these subjects, in the organization of a State government in harmony with the national Constitution and laws, and under which all citizens might enjoy their political and personal rights.

We are of the opinion, therefore, that when the people of Texas undertook a second time, in 1868, to establish a republican State government, it was competent for them, and for those to whom the duty was delegated, to deal as to them seemed best with all the legislation subsequent to the Act of Secession. It was the case of a people coming again into the possession and exercise of political power, of which they had been wrongfully deprived. If they thought proper, upon considerations of justice and expediency, to adopt any part of the work done by their self-constituted agents during a period of revolution and usurpation, they might do so; if, on the other hand, they thought proper to reject and repudiate all the acts of such pretended agents, they had the power so to do.

After much consideration of this subject, the rule expressed in the 33d Section of the general provisions of the Constitution was agreed upon, as a compromise of conflicting views. The legislation of 1866 was declared to be provisional only; and it was said, " its acts are to be respected only so far as they were " not in violation of the Constitution and laws of the United " States, or were not intended to reward those who participated " in the late rebellion, or to discriminate between citizens on ac- " count of race or color, or to operate prejudicially to any class " of citizens."

Now, whether an act falls within the denunciation of the 33d Section of Article 12 of the present Constitution or not, may be a question of law merely, or it may be a mixed question of law and fact. This court cannot judicially know that the act

incorporating the Houston & Great Northern Railroad Company, or the act of 13th of November, 1866, falls within the denunciation of the Constitution.

But the act of the 13th of November, 1866, did not unconditionally extend the operation of the law of 1854. The language of the act is, that " the grant of sixteen sections of land to rail-" road companies heretofore or hereafter constructing railroads in " Texas shall be extended, under the same restrictions and lim-" itations heretofore provided by law, for ten years after the " passage of this act." What were the limitations and restrictions provided by the law ? They are to be found in the 12th Section of the act of January 30th, 1854. Amongst the restrictions are the following : " No person or company shall re-" ceive any donation or benefit under this act, unless they shall " construct and complete at least twenty-five miles of the road " contemplated by their charter, within two years after the pas-" sage of this act ; and such donations shall be discontinued in " every case where the company or companies shall not actually " construct and complete at least twenty-five miles of the road " contemplated by their charter, each year after the construction " of said first mentioned twenty-five miles of road." Roads not having their terminus on the Gulf coast, the bays thereof, or on Buffalo Bayou, were exempted from the above condition. The Houston and Great Northern Railroad has a terminus on Buffalo Bayou, and we cannot agree with the counsel of the appellant when they assume that the company would be entitled to lands for twenty-five miles of road constructed at any time within the ten years from the passage of the act of November 13th, 1866. We think the spirit of the act of 1854 would require the company to build twenty-five miles of road within two years after the act of incorporation of October 22d, 1866, and twenty-five miles of road each year thereafter, in order to receive the benefits of the act.

The petition alleges that the company commenced the work of construction in March, 1870, and completed twenty-seven miles of road on the 8th of September, 1871. Obviously this

was not a compliance with the requirements of the law of 1854, and the company, by the 16th Section of its charter, was under obligations to comply with the terms and conditions of that law, in order to be in a position to claim its benefits. By this failure to build twenty-five miles of road within two years from the passage of the act of incorporation, the company must be held to have lost its right to claim land from the State, unless the condition of the country was such as to suspend the operation of the law of limitation.

What was the condition of Texas about the time of the organization of the company in 1867, and for three years thereafter?

On the 2d of March, 1867, the Congress of the United States passed the first of the series of acts popularly known as the Reconstruction Acts. During the same year the State was placed under military government; its principal executive and judicial officers were removed from office; the Legislature was not permitted to assemble, and a new scheme of reconstruction was inaugurated. The whole machinery of civil government put in operation in 1866 was subjected to military control. The state of war—not open, but suppressed war—continued. This condition of things did not cease until the acceptance of the present Constitution and the withdrawal of military government in the spring of 1870.

Now, in view of the force to be given to the act of the 11th of January, 1862, which, we have seen, extended the operation of the law of 1854, for the benefit of railroad companies, until after the close of the war, and by analogy to the constitutional rule in respect to the limitation of civil suits, it must, we think, be held that, from the 2d of March, 1867, until the acceptance of the present Constitution by the Congress of the United States, time did not run against any individual or corporation, to cut down any civil right.

We will not pause to consider the effect of President Johnson's proclamation of the 20th of August, 1866, declaring the insurrection in Texas at an end, upon a charter obtained from the

Legislature of that year; for, granting, as we do, that time did run against the appellant from the date of its charter to the subordination of the State government to military control, yet the two years had not expired. From the 22d of October, 1866, the date of the charter, to the 2d of March, 1867, when the State was subjected to military control, was a little less than five months; and from the 30th of March, 1870, the date of the acceptance by Congress of the present Constitution, to the 8th of September, 1871, when the twenty-seven miles of road were completed, was less than eighteen months. So, upon the view we take of this branch of the case, the company have not lost their right to claim the benefits of the act of 1854.

But it is insisted by the Attorney-General that all grants of land to railroad companies are destroyed and inhibited by the present Constitution. We do not think so.

The 6th Section of 10th Article of the Constitution, which provides that " The Legislature shall not hereafter grant lands to " any person or persons," etc., is plainly prospective in its operation, and was not intended to affect the claim of railroad companies to lands under former laws. It is not our information that such a meaning was claimed for it by any member of the Convention when this Section of the Constitution was under discussion.

The 7th Section of the 10th Article can only refer to lands that had previously been acquired by railroad companies, and which had not been alienated by said companies in conformity with their charters and the laws of the State under which the grants were made. How could companies have alienated lands which they had never acquired ? What law required them to do so ? The section has a plain meaning, and can only apply to " lands granted," and not alienated, as the laws of the State required.

It only remains to consider the power of the court to issue the writ of *mandamus*.

" It is a settled and invariable principle in the laws of Eng- " land," says Blackstone, " that every right, when withheld,

" must have a remedy, and every injury its proper redress."
We derive the writ of *mandamus* from the English law. It is
defined by Blackstone to be " a command issuing in the king's
" name from the court of King's Bench, and directed to any
" person, corporation, or inferior court of judicature in the
" king's dominion, requiring them to do some particular thing
" therein specified, which appertains to their office and duty, and
" which the court of King's Bench has previously determined,
" or at least supposes to be, consonant to right and justice."

In the case of King *v.* Baker, 3 Burroughs, Lord Mansfield
said : " This writ ought to be used upon all occasions where the
" law has established no specific remedy, and where in justice
" and good government there ought to be one."

In Marbury *v.* Madison, Chief Justice Marshall said : " It is
" not by the office of the person to whom the writ is directed,
" but the nature of the thing to be done, that the propriety or
" impropriety of issuing a *mandamus* is to be determined."
In the case of the Commissioner of the General Land Office *v.*
Smith, 5 Texas, Judge Wheeler said : " A *mandamus* may is-
" sue to compel the Commissioner of the General Land Office
" to issue a patent, when it shall be made to appear to the court
" that the right of the party is clear, and that it had been re-
" fused by the Commissioner."

We can see no reason why the propriety of issuing the writ
of *mandamus*, in any proper case, to the Commissioner of the
Land Office, or to any other officer of the State government,
should ever have been brought into question. It is said that
an officer cannot be compelled by a *mandamus* to do any act
involving an exercise of official discretion. This is very true,
when properly understood. It means that an officer cannot be
compelled by *mandamus* to do anything which the law gives
him a discretion not to do. It does not mean that the writ
will not issue to compel an officer to do any act the performance
of which requires an exercise of mind or judgment, such, for
example, as the identification of an individual. In this connec-
tion, we deem it proper to say that, while we entirely approve

the decision of this court in the case of The Houston Tap and Brazoria Railroad Company *v.* Randolph, 24 Texas, 317, we think there are propositions in the opinion of the court, stated in the way of argument, which are perhaps liable to miscon- struction, and therefore calculated to mislead.

It is not to be assumed that the courts will interfere in the business of the other departments of the government. It is the province of the courts to determine cases that are brought properly before them. To do this, cannot be any interference with the rights or duties of others. If any citizen has a right which is withheld from him, he may call upon the courts, in a. proper manner, to enforce his right. That the redress which the court thinks proper to award involves the performance by an officer of the Executive Department of the government, of a duty required of him by law, is certainly no reason why the court should withhold justice.

There are cases in which the writ of *mandamus* is the only remedy for a right withheld. In all such cases, the court would be wanting in the discharge of duty, to deny the writ.

We are of the opinion that there was error in the judgment of the District Court. The judgment of the District Court is therefore reversed, and the cause is remanded, to be proceeded with in accordance with this opinion.

WALKER, J. This is a proceeding in *mandamus*, com- menced in the District Court of Travis county, by the appel- lant.

By the terms of the act under which plaintiff claims incor- poration, it also claims the right to demand and receive such donations of land as are by law granted to other like incorpora- tions under an act which took effect on the 16th of April, 1854, which is entitled " An Act to encourage the construction of rail- " roads in Texas by donations of lands." This act provides that " any railroad company chartered by the Legislature of- " this State, heretofore · or hereafter constructing within the " limits of Texas a section of twenty-five miles or more of rail-

"road, shall be entitled to receive from the State a grant of six-
" teen sections of land for every mile of road so constructed and
" put in running order."

Section 6 of the act (Paschal's Digest, Article 4950) pro-
vides that, " any railroad company having completed and put in
" running order a section of twenty-five miles or more of its road,
" may give notice of the same to the Governor, whose duty it
" shall be to appoint some skillful engineer, if there be no
" State engineer, to examine said section of road, and if upon
" the report of said engineer, under oath, it shall appear that said
" road has been constructed in accordance with the provisions
" of its charter, and of the general laws of the State in force at
" the time, regulating railroads, thereupon it shall be the duty
" of the Commissioner of the General Land Office to issue to said
" company certificates of six hundred and forty acres each,
." equal in number to sixteen sections per mile of road so com-
" pleted."

The directory provisions of the act it is unnecessary to no-
tice. By reference to Article 4958, Paschal's Digest, that
which would seem to be a supplemental act provides, that no
road benefited by said act shall receive any donation of land
under its charter, or under the supplemental act, for any work
not done in ten years after the passage of the act; which went
into force on the 16th of April, 1854.

An act of the Legislature passed January 11th, 1862, Arti-
cle 4961, Paschal's Digest, provides, that any company entitled
to the benefits of the act of January 30th, 1854, and the act
supplementary thereto, should not forfeit any of its rights under
those laws, provided said company shall complete such section
or fraction of a section as to entitle it to donations of land un-
der existing laws, within two years after the close of the pres-
ent war between the Confederate States and the United States
of America.

An act of February 18th, 1862, Paschal's Digest, Article
4965, exonerates railroad companies from computation of the
time embraced in the war, in reckoning the period allowed

26

them in their charters for completing their several undertakings. The last of this series of acts was passed and took effect on the 13th day of November, 1866 (General Laws, 11th Legislature, page 212), and it provides, "that the grant of sixteen "sections of land to the mile to railroad companies, heretofore "or hereafter constructing railroads in Texas, shall be extended "under the same restrictions and limitations heretofore pro- "vided by law, for ten years after the passage of this act."

These are the several legislative enactments under which the plaintiff (or relator) seeks to make out its right to a peremptory *mandamus* against the defendant, to compel him to issue certificates for the land to which it alleges it is entitled.

The petition sets out a copy of the plaintiff's charter, which is contained in an act entitled "An Act to incorporate the "Houston and Great Northern Railroad Co.," passed on the 22d day of October, 1866. It further alleges that on the faith of the grants and guarantees of rights and privileges mentioned and set forth in its charter, and the laws to which it relates, that on the 13th day of May, 1867, in accordance with said laws and parts of laws, it organized as a body corporate and politic, in good faith and in compliance with the terms of its charter, accepting the grants, privileges, and franchises therein contained; and that, in compliance therewith and in accordance thereto, so acting as an incorporated company, it solicited and obtained private cash subscriptions from individuals, amounting in the aggregate to six millions of dollars. That said private subscriptions were made in good faith, by persons acting upon the promises and guarantees contained in the acts referred to ; that a large amount of money, to wit, fifteen hundred thousand dollars, has been expended in constructing and equipping the road which the company undertook to build. That said road does not run within five miles of any other railroad, parallel thereto. That, after the completion of twenty-seven miles of said railroad, it notified his Excellency the Governor of the State of Texas, thereof, and that, in accordance with law, he did send John W. Glenn, State Engineer, to examine and report upon

said road.   That said John W. Glenn has examined said road
and made his report, and that said report is favorable to the
rights and claims of the plaintiff.   The petition further alleges
that the plaintiff has duly complied with the terms of its char-
ter, reporting its organization, making annual reports; has filed
the required certificates, profiles, and maps showing the designa-
tion of its route, curvitures and grade of its road, in the Gene-
ral Land Office, and in the county surveyors' and clerks' offices
of the several counties through which its road has been located
and constructed.   And that the company commenced the work
of building its road on the ground in the month of March, 1870,
and had completed a section of twenty-seven miles on the 8th
day of September, 1871.

The plaintiff further alleges that a copy of the report of the
State Engineer has been duly delivered to the defendant; and
that, on the 6th day of October, 1871, the plaintiff, by its agent
and secretary, made demand on the defendant as Commissioner
of the General Land Office, for the land certificates to which it al-
leges itself entitled; and that the defendant refused and still re-
fuses to issue and deliver to the plaintiff said certificates, but al-
leges that the act of November 30th, 1866, and the other acts al-
ready referred to in this opinion, are no longer in force, and have
no binding validity upon him, because, he says, they are repealed
and superseded by the present Constitution of the State of Texas,
and that the plaintiff has no right to claim and receive said land-
certificates under said laws; all of which claims and pretenses
of defendant, plaintiff avers are untrue and contrary to equity
and right; and that if the present Constitution of the State be
inconsistent with, or contrary to the rights vested in plaintiff,
under and by virtue of its said charter and said general laws,
that said Constitution, in so far as it impairs the said rights of
plaintiff, is in violation of the Constitution of the United
States of America.

The plaintiff alleges, further, that he has no other adequate
remedy than by *mandamus* against the defendant, and that he
is entitled, by reason of the premises, to four hundred and

thirty certificates of the denomination of six hundred and forty acres each; and prays for the peremptory writ of *mandamus* and general relief.

The defendant answers the petition by way of demurrer, and by general denial. The grounds of demurrer and answers, as set forth, are as follows: "Now comes Jacob Keuchler, as the " Commissioner of the General Land Office of the State of Texas, " the defendant in the above entitled and numbered suit, by his " attorney, the Attorney-General of said State, and by way 'of " answer unto the petition of the plaintiff therein, he first de- " murs thereto, and says that the same is insufficient in law; and, " in addition to the other causes or grounds of demurrer, ap- " parent on the face of said petition, he assigns the following "causes or grounds of demurrer, to wit:

" *First.* Because it does not appear from said petition that " defendant can be compelled by *mandamus* to do any act or " acts involving an exercise of official discretion on his part.

" *Second.* Because it does not appear from said petition that " the plaintiff has been incorporated by a Legislature of said " State, organized and acting under a State Constitution accepted " by the Congress of the United States of America, or by a " Legislature competent to make a donation of a part of the " public domain of the State of Texas to a private corpora- " tion; but, on the contrary, it does appear from said petition, " that the plaintiff was only incorporated by the Legislature " of a provisional government of said State, which had no " power to create a private corporation, and to make it a grant " of land.

" *Third.* Because by Article 9 of the Constitution of said " State, accepted by said Congress, and more particularly by " Section 6 thereof, and by Article 10 of said Constitution, and " more particularly by Section 7 thereof, it appears that the " plaintiff has no cause of action.

" *Fourth.* Because, the school rights and privileges secured " by the Constitution of said State last aforesaid, are guaranteed " by an act of said Congress, entitled 'An Act to admit the

" ' State of Texas to representation in the Congress of the United
" ' States,' approved March 30, 1870.

" *Fifth.* Because the act incorporating the plaintiff is un-
" constitutional, null, and void on its face.

" *Sixth.* Because it does not appear from said petition that
" the twenty-seven miles of railroad alleged to be completed
" were completed, or were even commenced, prior to the adop-
" tion and acceptance of the present State Constitution.

" *Seventh.* Because the act of incorporation under and by
" virtue of which the plaintiff claims to be incorporated, is not
" a contract—said State not having under it, or by any law,
" the right to enforce a specific performance thereof, or to re-
" cover damages in case of non-performance.

" *Eighth.* Because no State government of Texas ever had,
" or now has, the constitutional authority to make a gift to a
" private corporation.

" *Ninth.* Because the State of Texas has the control of its
" public lands, and of every part thereof, until it has divested
" itself of the legal title to the same.

" *Tenth.* Because of other causes apparent on the face of
" said petition, which does not set out any cause of action, and
" which fails to show that the plaintiff is entitled to the relief
" sought, or to any relief—said petition being in effect a suit
" against the State without its consent, over which this court
" has no jurisdiction.

" And by way of further answer defendant avers that he has
" no knowledge of the railroad, and of the matters and things
" touching the same, in said petition alleged, and that being
" sued in his official capacity, and not individually, he conceives
" it to be his duty to deny, and he accordingly denies, all and
" singular the allegations in said petition contained, and calls
" for strict proof thereof. And by way of further answer, de-
" fendant avers that on the facts officially brought to his notice
" by the records and papers of the General Land Office of the
" State of Texas, touching the pretended claim for land certifi-
" cates asserted by plaintiff in the petition aforesaid, defendant

" as Commissioner of said Land Office has adjudicated that " plaintiff is not entitled to demand and receive the same, or " any part thereof; and defendant now again so adjudicates."

The judgment of the District Court is predicated on the 7th cause of demurrer, and to this judgment the plaintiff excepted, and his bill of exceptions is as follows :

" Be it remembered that on the hearing of the above stated " cause, upon the demurrer of the defendant to the petition of " plaintiff, before the Hon. J. P. Richardson, judge presiding " in the District Court of Travis county, the said demurrer was " sustained upon the ground and opinion expressed by the " judge, that the act of incorporation of the 22d October, 1866, " made part of the petition, under the 16th Section of which " the plaintiff claims, and the organization under and acceptance " of said act by plaintiff, in manner as alleged, did not consti- " tute a contract between the plaintiff and the State of Texas, " under and by virtue of which the plaintiff is now entitled to " the issue of land certificates by defendant in manner as claimed, " and that it was not necessary to express any opinion or to de- " cide upon the other grounds specified in the defendant's de- " murrer, and accordingly, upon the opinion expressed as afore- " said, the court dismissed the plaintiff's petition ; to which opin- " ion of the court, upon the ground aforesaid, and the decision " thereon, the plaintiff excepted at the time, and now tenders " this bill of exceptions, that the same may be signed, sealed, " and certified, and made part of the record, which is accord- " ingly done in open court, this 24th of October, A.D. 1871."

There are but two assignments for error to the judgment of the District Court ; they are as follows :

" First. The District Court erred in sustaining the demur- " rer of defendant to the plaintiff's petition and suit.

" Second. The District Court erred in its opinion upon said " demurrer, as set forth in the bill of exceptions taken by " plaintiff, signed and sealed by the judge, and on file in said " cause."

The judge of the District Court appears to have considered

the seventh cause of demurrer as well taken, and upon that he predicates his judgment.

We might also decide the case by considering the single question presented by the bill of exceptions; but by so doing we might not be able to dispose of it in a manner satisfactory to the parties. I will therefore endeavor to examine the different causes of demurrer assigned, and so far as I may be able, determine them by the light of authority, and the application of recognized principles of law. And I may remark that I am not insensible to the great delicacy and importance of these questions, not only to the parties concerned, but to the people of the State.

In the case of Fletcher v. Peck, 6 Cranch, 128, that great and good man, Chief Justice Marshall, when approaching the solution of questions similar to those now presented for our decision, thought it not improper to say: " The question whether " a law be void for its repugnancy to the Constitution, is at all " times a question of much delicacy, which ought seldom, if " ever, to be decided in the affirmative in a doubtful case. The " court, when impelled by duty to render such a judgment, " would be unworthy of its station, could it be unmindful of " the solemn obligations which that station imposes. But it is " not on slight implication and vague conjecture that the Legis- " ture is to be pronounced to have transcended its powers, and " its acts to be considered as void. The opposition between the " Constitution and the law should be such, that the judge feels " a clear and strong conviction of their incompatibility with " each other."

Whether the act, on the part of the Commissioner, of issuing the certificates to which the plaintiff alleges itself entitled, lies within the boundary of discretion, to be performed or not, as he shall determine or " adjudicate," is the question presented by the first assignment of demurrer.

In the case of Amos Kendall, Postmaster-General of the U. S. v. The United States, on the relation of Wm. B. Stokes and others, 12 Peters, 524, we find abundant authority for saying,

as was said by Chief Justice Taney in that case, *Mandamus* does not seek to direct or control the Commissioner in the discharge of an official duty of an executive character, much less of any supposed judicial function vested in him, but simply to enforce a performance of a ministerial act.

I will not here discuss the question whether the Legislature had the right to direct the performance of the act, farther than is necessary to dispose of this branch of the demurrer. Conceding for a moment that the Legislature had the power, then, if the plaintiff acquired a right under the exercise of this power by the Legislature, there must be somewhere a remedy for the enforcement of the right; and by numerous authorities of the highest respectability, some of which will be hereafter referred to in this opinion, I am forced to the conclusion that the plaintiff, by its petition, has set forth a good cause of action to enforce a right secured by an act of the Legislature, of a precise, definite, and specific character, clearly and plainly enjoined by law. And I have applied the strictest rules of pleading to the petition, and am clearly of opinion that the demurrer ought not to be sustained, either to its form or substance. But this will not excuse us from the further duty of examining the whole case made upon the petition and demurrer. In Kendall *v.* The United States, 12 Peters, 625, Chief Justice Taney, in delivering the opinion of the court, remarks: " We all agree that by " the act of July 2d, 1836, it was the duty of the Postmaster- " General to credit Stockton and Stokes with the amount " awarded by the solicitor of the Treasury; that no discretion- " ary power in relation to the award was given to the Post- " master-General; and that the duty enjoined upon him was " merely ministerial. These principles being agreed on, it fol- " lows that this was a proper case for a *mandamus*, provided " Congress have conferred on the Circuit Court for the District " of Columbia the prerogative jurisdiction and powers exer- " cised by the court of King's Bench, in England; for Stockton " and Stokes are entitled to have the credit entered in the man- " ner directed by the Act of Congress, and they have no other

" specific means provided by law for compelling the perform-
" ance of this duty. In such a case, the court of King's Bench,
" in England, would undoubtedly issue the writ of *Mandamus*
" to such an officer, commanding him to enter the credit."

Is the act on the part of the Commissioner of the General
Land Office of issuing certificates for land to persons entitled to
them, merely discretionary on his part, and left to his final
judgment?

Certainly, neither the statutes nor the adjudications had upon
this subject would answer this question in the affirmative. In
the case of Ward, the Commissioner of the General Land Office, *v.*
Nathaniel Townsend, 2 Texas, 581, which is believed to be the
first case in which the right to *mandamus* was made apparent
to the court, the chief justice delivered the opinion. The writ
*nisi* was made peremptory. In the case of Hosner *v.*
De Young, reported in 1 Texas, 764, the writ was refused;
and, as we are told in the conclusion of the opinion, it was
because " the plaintiff not having pursued his remedy in the
" mode in which the State consented to be sued, he cannot be
" permitted to seek it in any other way." This was a proceed-
ing to compel a district surveyor to make a survey of a certain
tract of land, by virtue of a fraudulent certificate.

A remark of the learned judge, in deciding this case, may
not be inapt here : " The fee," says Justice Lipscomb, " being
" in the government until it passes into a perfect grant, no suit
" can be sustained to compel the government to divest itself of
" the title, until the political authority has prescribed the mode
" in which it shall be done; that in all such cases the political
" authority can establish, alter, and modify such regulations from
" time to time as may be deemed necessary in maturing an im-
" perfect into a perfect title; that this control is necessary to
" the protection of the public domain and a consequence result-
" ing from the fee being in the government."

This is a plain acknowledgment on the part of the learned
judge, that what is here called the political authority had con-
trol over the public domain, the power to divest the State of

the fee.  And it would not seem difficult to determine what would be the reasoning and conclusion, in a case where the authority had been properly exercised.  (See Lewis *v.* The City of San Antonio, 7 Texas, 288 ; The State *v.* Delesdenier, 7 Texas, 76 ; Blair *v.* Odin, 3 Texas, 288 ; Paschal *v.* Perez, 7 Texas, 266 ; Clark *v.* Smith, 13 Peters, 195 ; 6 Cranch, 78 ; 9 Id., 11.)

In the case of the Commissioner of the General Land Office *v.* Smith, 5 Texas, 471, the opinion of the court was delivered by Mr. Justice Wheeler.  The court decided that the writ of *mandamus* lies as a private remedy, to compel the heads of departments to perform a duty, in cases where the duty is plain and there is no discretion ; and that the writ will not lie against an officer to compel the performance of a duty other than that which is ministerial.  A very apt quotation is introduced into this opinion, from that of Chief Justice Taney, delivered in Kendall *v.* Stokes, 3 Howard, 100 ; this extract explains in a very concise manner the nature of the remedy by *mandamus.*

" Originally this was not regarded as an action by the party, " but as a prerogative writ, commanding the execution of an " act, where otherwise justice would be obstructed, and issuing " only in cases relating to the public and government; and it " was never issued where the party had any other remedy.  It " is now regarded as an action by the party on whose relation it " is granted ; but subject still to this restriction, that it cannot " be granted to a party where the law affords him any other " adequate means of redress."

I quote further from the opinion of Justice Wheeler :

" Respecting the general rule, there does not appear to have " been any question ; but the difficulty has been in making its " application to particular cases, and in determining in such " cases what acts are to be considered as merely ministerial, and " what not.

" The distinction between ministerial and judicial and other " official acts seems to be, that where the law prescribes and de- " fines the duty to be performed with such precision and certainty

" as to leave nothing to the exercise of discretion or judgment,
" the act is ministerial; but where the act to be done involves
" the exercise of discretion or judgment in determining whether
" the duty exists, it is not to be deemed merely ministerial.
" (14 Pet. R., 497, 514, 515 ; 12 Pet. R., 524 ; 6 How., U. S.
" R., 100 ; McElrath v. McIntosh et al., Monthly Law Rep.,
" N. S., Vol. I., No. 9, p. 399, and cases cited.)
     " There are various duties assigned by law to the Commis-
" sioner of the General Land Office, to be performed before the
" patent can issue.   He must pass upon the validity of the cer-
" tificate and the survey, he must determine whether both are
" of such a character as, under the law, to entitle the party to a
" patent; he must also determine whether the land sought to be
" conveyed was vacant when located, or was appropriated by
" any previous claim which he is required by law to respect.
" When these, and such other questions as may address them-
" selves to the commissioner under the laws prescribing his
" official duties, shall have been resolved in favor of the appli-
" cant, his right to his patent is clear and indisputable.   The is-
" suing of the patent then becomes a ministerial act, involving
" no exercise of judgment, and one which the commissioner has
" no discretion to refuse.   To withhold it would be the violation
" of a vested legal right.   (1 Cond. R. S. C., 275.)   And to
" deny the writ in such a case would be to deny a remedy where
" the right is clear and its violation palpable.   Such a resolu-
" tion would ill comport with the administration of justice in a
" government of laws.   (Id., 275, 6.)
     " In the case of Marbury v. Madison, Chief Justice Marshall
" said : ' The question whether a right has vested, or not, is in
" ' its nature judicial, and must be tried by the judicial authority.'
" The determination of that question, manifestly, is an exercise
" of judicial authority, which must intervene in every case where
" the court is called upon to determine upon the rights of a
" party ; and no less in the case of an application for a manda-
" mus than in any other case.   The court must judicially deter-
" mine the rights of the party.   But if the right be clear and

" has been denied, the authority of the court to apply the
" remedy is, we think, very clearly maintainable. Without
" considering in their order the several objections which have
" been urged to the awarding of the writ in this instance, I con-
" clude that a *mandamus* may issue to compel the Commis-.
" sioner of the Land Office to issue a patent, when it shall
" have been made to appear to the court that the right
" of the party is clear, and that it has been refused by the
" commissioner."

The cases referred to in defendant's brief, on this point, are
as follows: The Board of Land Commissioners *v.* Walling,
Dallam, 524; Hosner *v.* De Young, 1 Texas, 769; League *v.*
De Young, 2 Texas, 500: Marshall *v.* Clark, 22 Texas, 23;
Kentucky *v.* Ohio, 24 Howard, 66.

I cannot see that the learned argument of the Attorney-
General derives much force from the cases referred to in our
own reports; nor does the case of Kentucky *v.* Ohio, 24 How-
ard, conflict with the doctrine of our own decisions. An ex-
tract from the opinion of the chief justice may illustrate the
views of that learned court, so far as they appertain to our juris-
diction of the case at bar. (24 Howard, 97.) " It is equally
" well settled that a *mandamus* in modern practice is nothing
" more than an action at law between the parties, and is not
" now regarded as a prerogative writ. It undoubtedly came
" into use by virtue of the prerogative power of the English
" Crown, and was subject to regulations and rules which have
" long since been disused. But the right to the writ, and the
" power to issue it, has ceased to depend upon any prerogative
" power, and it is now regarded as an ordinary process in cases
" to which it is applicable. It was so held by this court in the
" cases of Kendall *v.* United States, 12 Peters, 615; Kendall *v.*
" Stokes and others, 3 Howard, 100. So, also, as to the process
" in the name of the Governor, in his official capacity, in behalf
" of the State. In the case of Madraso *v.* The Governor of
" Georgia, 1 Peters, 110, it was decided that in a case where
" the chief magistrate of a State is sued, not by his name as an

" individual, but by his style of office, and the 'claim made
" upon him is entirely in his official character, the State itself
" may be considered a party on the record.    This was a case
" where the State was the defendant; the practice, where it is
" plaintiff, has been frequently adopted by suing in the name
" of the Governor in behalf of the State, and was indeed the
"form originally used, and always recognized as the suit of the
" State.

    " Thus, in the first case to be found in our reports in which
" a suit was brought by a State, it was entitled, and set forth in
" the bill, as the suit of ' The State of Georgia, by Edward Tell-
" ' fair, Governor of the said State, complainant, against Samuel
" ' Brailsford and others ; ' and the second case, which was as
" early as 1793, was entitled and set forth in the pleadings as
" the suit of ' His Excellency Edward Tellfair, Esquire, Gov-
" ' ernor and Commander-in-chief in and over the State of
" ' Georgia, in behalf of the said State, complainant, against
" ' Samuel Brailsford and others, defendants.'

    " The cases referred to leave no question open to controversy,
" as to the jurisdiction of the court.    They show that it has been
" the established doctrine upon this subject ever since the act
" of 1789, that in all cases where original· jurisdiction is given
" by the Constitution, this court has authority to exercise it
" without any further act of Congress to regulate its process or
" confer jurisdiction, and that the court may regulate and mold
" the process it uses in such manner as in its judgment will best
" promote the purposes of justice.

    " And that it has also been settled, that where the State is a
" party, plaintiff or defendant, the Governor represents the
" State, and the suit may be, in form, a suit by him as Governor
" in behalf of the State, where the State is plaintiff; and he
" must be summoned or notified as the officer representing the
" State, where the State is defendant. ·

    " And further, that the writ of *mandamus* does not issue
" from or by any prerogative power, and is nothing more than
" the ordinary process of a court of justice, to which every one

" is entitled, where it is the appropriate process for asserting the
" right he claims. We may therefore dismiss the question of
" jurisdiction without further comment, as it is very clear, that
" if the right claimed by Kentucky can be enforced by judicial
" process, the proceeding by *mandamus* is the only mode in
" which the object can be accomplished."

But our own decisions are almost uniform in maintaining the
jurisdiction of the court, and it will be seen that wherever a
case has come before this court in which the right to a writ of
*mandamus* has been made apparent, it has been awarded; and
I think the following cases sustain the right of the plaintiff to
the writ of *mandamus* in the case at bar:—Arberry *v.* Beavers
*et al.*, 6 Texas, 457; Horton *v.* Pace, 9 Texas, 81; Myers *v.*
Carolan, 9 Texas, 250; Stewart *et al. v.* Crosby, 15 Texas, 546;
McClellan *v.* Shaw, 15 Texas, 319; Jones *v.* Shaw and Swisher,
15 Texas, 577; Auditorial Board *v.* Arles, 15 Texas, 72; Lind-
say *v.* Luckett, 20 Texas, 516; Auditorial Board *v.* Hendricks,
20 Texas, 60; Pickett *v.* White, 22 Texas, 559; Winder *v.*
Williams, 23 Texas, 601; Durrett *v.* Crosby, 28 Texas, 687;
Tabor *v.* The Commissioner of the General Land Office, 29
Texas, 508.

The first section of the act to encourage the construction of
railroads in Texas, Article 4945 Paschal's Digest, declares that
" any railroad company chartered by the State, which shall con-
" struct twenty-five miles or more of railroad, shall be entitled
" to receive from the State a grant of sixteen . sections of land
" for every mile of road so constructed and put in running
" order."

Our attention has been called to the case of Houston Tap and
Brazoria Railway Company *v.* C. H. Randolph, Treasurer, &c.
(24 Texas, 317.) This was a petition for *mandamus* against the
Treasurer and Comptroller, to compel the Treasurer to pay over
one hundred and fifty thousand dollars to the agent of the com-
pany, in the five per cent. indemnity bonds, on the warrant of
the Board of Special Commissioners appointed to invest the
funds in the bonds of railroad companies. The reasoning in .

this case by the learned court proceeds upon the idea that the judiciary cannot supervise or control the executive department of the government in the discharge of its duties; otherwise the judicial would cease to be a co-ordinate branch of the government and become paramount and superior. The proposition, as thus stated, does not admit of argument, but I do not think it was applicable to the case then under consideration, nor to the one at bar. The proposition is not fairly stated, it should be stated thus: Is the executive department, and are the heads of departments, subject to the law, and if so, who is to declare the law? Can a head of department, or the Executive, set at nought the rights of the citizen, in defiance of the law, and is there no remedy; is there nowhere a power to declare the law and redress the wrong; and will it be said that if that power shall declare that the Executive or the head of a department has misconceived or disregarded the law, it becomes a usurper?

The law is over us all; it is the shield and bulwark of Liberty.

Life, liberty and property depend upon it, and it is the sole duty and sacred office of the judiciary to interpret and declare the law. If the Executive and heads of departments are above the law, and not subject to it, then indeed it would not be necessary that the law should be interpreted or declared, and the courts would have no duty to perform in relation to their acts. But free governments place no man above the law; the President of the United States, and every department of the general government, submit to the decisions of the Supreme Court, and govern themselves accordingly; and so it is in the State governments. The Supreme Courts do not make laws for the government of departments, but they declare the true interpretation to be given to the laws as placed before them, and this is no usurpation, nor does it introduce into our system any clash of governmental functions.

The principle laid down by Mr. Justice Roberts, as that upon which the relator must sustain his right to *mandamus*, is correct; and it is as follows:

" It is well settled that to entitle a party to the extraordinary

" remedy of *mandamus*, the petition must state facts which " show, if true, that the plaintiff has a clear right to the per- " formance of the thing demanded; and that it is plainly the " duty of the officer proceeded against to perform such things."

The fact, then, being settled, that the company has complied with the provisions of the law, it becomes entitled, &c.

It is the duty, then, of the commissioner to know the facts before he issues the certificates; but it would be asking too much of him to determine the validity of the law, and it would enforce upon him a judicial duty which the law reposes elsewhere. And the law further says, that when a railroad company has complied with the provisions of its charter, and of the general laws of the State in force at the time, regulating railroads, " Thereupon it shall be the duty of the Commissioner of " the General Land Office to issue to said company," &c., &c.

Then the prerequisite conditions on the part of the company being complied with, the duty of the commissioner is made plain by the law, and he has no other guide in the exercise of his duty than the law itself; it is to him the declared will of a higher authority. But in all cases the commissioner should be duly cautious that the right to the certificate has been made apparent before he issues it; and if it be made to appear to him that the law under which the certificate is claimed has been declared unconstitutional, or has been repealed, then it becomes his duty to withhold the certificate.

It may be just to remark here, that considering the doubts which may exist in the most enlightened legal judgment, touching at least some of the questions raised by the demurrer in this case, that the course pursued by the commissioner, in virtually referring the matter to the judicial tribunals, is not unworthy of commendation. But I do not think the commissioner has any such discretion in the premises as would render his decision final, or exonerate him from a *mandamus*.

The second ground of demurrer assumes that the plaintiff is not an incorporated company, and that the Legislature which passed the act under which the plaintiff claims incorporation

was not a legally constituted body, endowed with power and authority to create corporations and make donations of land from the public domain.

The latter clause of the 33d Section of the 12th Article of the Constitution of 1869 is the highest authority to which I could refer upon this subject. It reads as follows: " The " Legislature which assembled in the City of Austin, on the " 6th day of August, 1866, was provisional only, and its acts " are to be respected only so far as they were not in violation of " the Constitution and laws of the United States ; or were not " intended to reward those who participated in the late rebellion ; " or to discriminate between citizens on account of race or color ; " or to operate prejudicially to any class of citizens."

I do not think that the act of the 22d October, 1866, under which the plaintiff claims its franchise, can be included in any of the acts thus set aside by this section of our present Constitution.

Some history, and a good deal of law, may be referred to, to support this conclusion.

The act of Congress passed on the 2d of March, 1867, did not set aside any of the laws which had been passed by the provisional Legislatures of Louisiana and Texas, but left them " subject to the paramount authority of the United States, at " any time, to abolish, modify, control, or supersede the same."

And Lieutenant-General Sheridan, the first military commander of the district, in General Orders, No. 1, dated 19th March, 1867, says: " According to the provisions of the 6th " Section of the Act of Congress, above cited (Act of 2d March, " 1867), the present State and municipal governments in the " States of Louisiana and Texas are hereby declared to be pro- " visional only, and subject to be abolished, modified, controlled, " or superseded."

Though the power was, in a number of instances, exercised by the different commanders of the district, it does not appear that any of the laws upon which the plaintiff bases its claim to land certificates were ever interfered with.

27

It is a matter of judicial knowledge, that the distinction made by the military commanders of the 5th District was made to deny the force and efficacy of those laws which had been passed in aid of the rebellion, whilst there was little or no interference with such acts of any prior Legislature as did not fall plainly within this rule.

The following authorities abundantly establish my conclusion: see proclamation of the Governor of Texas, dated October 25th, 1867; and the authorities cited in plaintiff's brief, Luter v. Hunter, 30 Texas, 688, 690, 704, and 705: Shroeder v. The State, 30 Texas, 389; Jones v. McMahan, 30 Texas, 719; Smith v. Harbert, 30 Texas, 670; Maloney v. Roberts, 32 Texas, 136; Hargrove v. De Lisle, 32 Texas, 170; also, Bennett and Harris v. The State, 30 Texas, 521 and 523; and Elsner v. The State, 30 Texas, 524.

This question is fully discussed in the case of The State v. White and Chiles, decided by the Supreme Court of the United States, in an able opinion delivered by Chief Justice Chase. In no part of this opinion are the acts of the provisional Legislature of Texas called in question. Mr. Justice Grier, Mr. Justice Swain, and Mr. Justice Miller dissented from the majority of the court, maintaining that the State of Texas was not at the time one of the United States. I take the following extract from the opinion of the court. Speaking of the laws known as the reconstruction laws, the court say: " But " it is important to observe that these acts themselves show " that the governments which had been established, and had " been in actual operation under executive direction, were " recognized by Congress as provisional, as existing, and as " capable of continuance. By the act of March 2d, 1867 " (United States Statutes, 428), the first of the series, these " governments were indeed pronounced illegal, and were sub- " jected to military control, and were declared to be provisional " only; and by the supplementary act of July 19th, 1867, the " third of the series, it was further declared, that it was the " true intent and meaning of the act of March 2d that the

" governments then existing were not legal State govern-
" ments, and if continued, were to be continued subject to mili-
" tary commanders of the respective districts, and to the para-
" mount authority of Congress. We do not inquire here into
" the constitutionality of this legislation, so far as it relates to
" military authority, or to the paramount authority of Congress.
" It suffices to say, that the terms of the acts necessarily imply
" recognition of actually existing governments, and that, in
" point of fact, the governments thus recognized in some im-
" portant respects still exist."

I think it a fair and legitimate inference that whatever laws
were passed by these Legislatures in accordance with the Con-
stitution of the United States, and the Constitution of the
State, and have not been declared void by Congress, by the
military commanders of the Districts, or repealed by subse-
quent legislation, are still in force and binding on the peo-
ple of the States and on the States themselves.

It would extend this opinion to an unwarrantable length,
and necessarily lead to the discussion of questions rather
within the province of politics than law, were I to pursue this
branch of the case farther; I deem it settled for all practical
and useful purposes.

But there are some facts of which the court must take ju-
dicial notice; they are among the public records and archives
of the State, and serve well to illustrate what has been the
well understood law touching this question, so far as concerns
our own State.

A number of the acts of the 11th Legislature have been
repealed and amended by the 12th. This is an acknowl-
edgment on the part of the 12th Legislature of the law-
making function in the 11th.

The Executive and the heads of departments have and do
recognize the binding force of the acts of the 11th Legis-
lature, wherever they are not considered in violation of the
Constitution and laws of the United States, or were not enacted
in favor of that class of citizens who took part against the Uni-

ted States in the late war, or did not make race or color a subject of discrimination.

As to the power of the 11th Legislature to make donations of land to railroad companies, I can conceive of no limit to its power which will not as well apply to any other legislature.

But so far as the rights of the parties here are to be fixed or affected by law, the political disturbances and complications of the State Government do not, as I conceive, affect the law of the case; for if the government in force in 1866, instead of being provisional as so called, had been revolutionary, or had been administered by the power of usurpation, nevertheless many of its acts would, by the principles of national law, be binding on its successor. This principle is discussed by Grotius, *De Jure Belli et Pacis*, and is rendered so easy to the comprehension that I take the liberty of both ornamenting and strengthening my opinion by a lengthy extract, from which it will be seen that whilst the successor is not always bound by the acts of the predecessor, yet in all matters of justice and right where the State and the people have received no wrong, the successor will be bound by the acts, gifts, laws, and even donations of the predecessor.

An interesting question might be thought to arise here, growing out of the Richmond government, regarding its acts; but the whole question is answered if we bear in mind that the Richmond government had neither predecessor nor successor; it rose without foundation and fell without ruin.

A free but accurate translation from Grotius is as follows:
" Let us proceed to the case of successors; and with regard to
" them we must make a distinction, whether they are heirs to
" the whole property of the deceased as well as to the kingdom,
" as those who receive a patrimonial kingdom by testament, or
" by intestacy; or whether they are only successors to the king-
" dom, suppose by a new election or by the law of the land,
" or by some imitation of the common rule of inheritance, or
" otherwise; or whether, finally, they succeed by mixed right.
    " For with regard to those who are heirs of all the property

" as well as of the kingdom, there can be no doubt that they
" are bound by the promises and contracts of their predecessor.
" For the rule that the property of the deceased is bound for
" debts, even for personal debts, is a rule coeval with property
" itself.

XI., 1.   But of those who succeed only to the kingdom;
" or to the property as sharers only, but to the kingdom
" alone; how far they are bound is a matter worthy of inquiry,
" especially as it has hitherto been treated very confusedly.
" That the successors of the kingdom, as such, are not directly
" and *immediately* bound (by those contracts) is evident enough;
" because they receive their rights, not from him who has
" lately deceased, but from the people; whether the rule of suc-
" cession approach more nearly to the rule of common inherit-
" ance, or recede further from it; of which difference we have
" treated above."

" 2.   But *mediately*, that is by the mediate effect of the State,
" such successors also are bound; which will be thus under-
" stood : Every society, no less than individual persons, has
" the right of binding itself by its own act, or that of
" the majority.   And this right it may transfer, either express-
" ly or by necessary consequence, suppose by transferring
" the government; for in moral matters, he who gives the
" end, gives the means which lead to the end.

" XII., 1.   But this does not go to an infinite extent.   For
" an infinite power of imposing such obligations is not neces-
" sary in order rightly to exercise the government; as such
" power also is not necessary for a guardian or a tutor, but
" only so much as the nature of the office requires.   The
" *tutor is reckoned in the place of the owner, says Julian, when*
" *he administers his pupil's affairs, not when he plunders him;*
" and in this sense we are to understand what Ulpian says,
" that the contract of the master of a society may not only
" bring advantage to the society, but also disadvantage.   But
" yet we are not, as some hold, to reduce the engagements
" of a king to the rules of one man undertaking another's

" business; namely, that his acts are then only valid when
" they turn out to the advantage of the principal party. For
" to put the ruler of the state to such a strait would be dan-
" gerous to the state itself.   And accordingly, the commu-
" nity is to be supposed to have held  this opinion when it
" bestowed the government upon him.   And what the Ro-
" man  emperors  declared, in a rescript with respect to the
" corporation of a town, that what was transacted by the mag-
" istrates should be of force in a doubtful case, but not if what
" was unquestionably due was given away, may be and ought
" to be applied to our question relative to the whole people,
" observing a due proportion in the application.

    " 2. As the subjects are not bound by every law; for there
" may be laws (even without going to those which command
" something unlawful) which are evidently foolish and absurd;
" so too the contracts of governors then bind their subjects when
" they have a probable reason; and in a doubtful case this may
" be presumed, on the authority of the governors.   And this
" distinction is much better than that which is put forth by
" many, governed by the result, according as it is a moderate or
" an immoderate damage.

    " For it is not the result which is to be regarded in such a
" case, but the probable reason for doing the thing; if there
" be such a reason, the people itself will be bound, if by any
" event it should become its own master; and the successors to
" the government, as the heads of the people.   For in like
" manner, if a free people had made any engagement, he who
" afterwards should receive the sovereignty, in the fullest man-
" ner would be bound by the engagement.

    " 3. The emperor Titus is praised on this account, that he would
" not allow himself to be petitioned to confirm anything which
" his predecessors had granted (holding them valid without such
" process); while Tiberius and those emperors who followed
" him did not recognize the grants of their predecessors as valid
" till they had themselves repeated them.   The excellent em-
" peror Nerva, following the example of Titus, says, in an edict

" which is extant in Pliny : *Let no man suppose that what he*
" *has obtained from another prince, either privately or public-*
" *ly, shall be by me revoked, that so, if I confirm those grants*
" *he may be the more obliged to me ; no man's congratulation*
" *need be accompanied by such petitions.* But, on the other
" hand, when Tacitus had related of Vitellius that he had torn
" the empire in pieces, reckless of the interests of posterity, the
" common world flocking about him to catch his extravagant
" gifts, and some even purchasing his favor with money, he
" adds : *Wise men held those grants to be void which could be*
" *neither given nor received without damage to the state.*

" 4. That must also here be added, that if in any case a con-
" tract begins to tend not only to some loss, but to the ruin of
" the community, so that from the beginning the contract in its
" extension to that case would have been unjust and unlawful ;
" then that contract may, not so much be revoked, as declared
" not to be binding any longer, as being made without the con-
" dition without which it could not justly be made.

" 5. What we have said of contracts holds, also, of the alien-
" ation of the people's money, and of any other things which the
" king has by law a power to alienate for the public good.    For
" here, too, a similar distinction is to be applied, whether there
" was a probable reason for giving or otherwise alienating.

" 6. But if the engagements have reference to the alienation
" of the kingdom or its parts, or of the royal patrimony, they
" will be invalid, as being a contract about that which is
" another's.    The same will hold in limited monarchies, if there
" be any matter or kind of act which the people has excepted
" from the royal power.    For, in order to give validity to such
" acts, there is required the consent of the people, either by it-
" self or by those who legitimately represent the people ; as
" may be understood by what we have said above respecting
" alienation.    By the application of these distinctions it will be
" easy to judge whether the pleas of kings who refuse to pay
" their predecessors' debts, not being their heirs, are just or un-
• " just ; of which examples may be seen in Bodinus.

" XIII. Nor is that which many have delivered, that the fa-
" vors of princes, granted out of pure liberality, may at any time
" be revoked, to be allowed to pass on without distinction. For
." there are some grants which the king makes out of his own
" property, and which, except they are granted expressly during
" pleasure only, have the force of a complete donation. And
" these cannot be revoked except, in the case of subjects, in the
" way of penalty, or for the sake of public utility, and then with
" compensation, if it may be. There are other grants which
" merely remove legal restrictions, without any contract. These
" are revocable; because the law which is relaxed universally
" may always be re-established particularly. For, in this case,
" no right against the author of the law is acquired.

" XIV. By contracts made by those who, without right, have
" usurped the government, the people or the legitimate sov-
" ereign are not bound. For usurpers have no authority to bind
" the people. However, the people are bound by what has been
" expended for their benefit (by an usurper); that is, so far as
" they are the richer for it."

It will be seen that this reasoning proceeds upon the doctrine
that the successor must be benefited, or at least receive no inju-
ry from the acts of the predecessor, to be bound by them. I
can but regard this as applicable only to a question unnecessarily
raised in the case at bar.

For the purpose of the argument, let it be conceded that the
State of Texas had a legal right to withdraw herself from the
Union, and that, by her act of secession, she accomplished
the dissolution of her allegiance to the government of the Unit-
ed States, and, until conquered by the United States and finally
restored to her place in the Union, she was an independent State,
making laws for her own government, and administering them
through her own tribunals; she must then be regarded as a sub-
jugated State, over which the conqueror has assumed dominion
and control, and the present government, however like it may
be to the former, is nevertheless a new sovereignty. What,
then, shall become of the laws which have been enacted by the

conquered government during its sovereignty? In so far as they are not inconsistent with the Constitution and laws of the new government, they will stand as the sovereign will. If, then, the laws passed by the Legislature of 1866 had been the laws of a government since conquered and subjugated by the present government of Texas, they would still be the law of the land, unless expressly abrogated or found in conflict with the present Constitution and laws.

Halleck, in his work on international law and the laws of war, discusses this question as follows: "When a country "which has been conquered is ceded to the conqueror by the "treaty of peace, the *plenum et utile dominium* of the con- "queror will be considered as having existed from the begin- "ning of the conquest. When it is said that the law political "ceases on the conquest, and that the law municipal continues "till changed by the will of the conqueror, it is not meant that "these latter laws *proprio vigore* remain in force; but that it "is presumed the new political sovereign has adopted and con- "tinued them as a matter of convenience. They do not derive "any force from the will of the conquered; for the person "capable of having and expressing a will, the body politic or "law-making power of the conquered, is extinguished by the "conquest. When, therefore, we come to pronounce upon the "force of a law of the conquered people after the conquest, "and to determine whether it has been tacitly adopted by the "conqueror, we must look to the character of its provisions, "and compare them with the laws and institutions of the con- "quering State; that is, with the will of the conqueror as *ex-* "*pressed* by himself in similar matters. Whatever is in conflict "with, or directly opposed to such expressions of his will, we "cannot presume to have been adopted by his tacit consent. "Hence, Lord Coke says, if a Christian king should conquer an "infidel country, the laws of the conquered, *ipso facto*, cease, "because it is not to be presumed that a Christian king has "adopted the laws of an infidel race. But, where there is no "such conflict in the institutions and laws of the two countries,

" those of the conquered which regulate personal relations, com-
" mercial transactions, and property in all its modes of transfer
" and acquisition, are presumed to have been adopted as a matter
" of convenience."

This reasoning, then, must lead me to the presumption that
the laws of 1866, not expressly in conflict with the present Con-
stitution and laws of Texas, nor expressly abrogated, are still
to be considered in force, if I am to regard Texas in any legal
sense as ever having been out of the Union, since she first be-
came an integral part of it.

But the Convention which framed our Constitution have left
us no ground for speculative reasoning.   There can be no such
misunderstanding of the language of the Constitution as would
leave a doubt that the act under which the plaintiff claims its
franchise is not one of the laws which is abrogated and set
aside.

The sixteenth section of the act contains the following lan-
guage:  " This company shall be entitled to receive such dona-
" tions of land as are provided for the encouragement of
" internal improvements by any general law of the State."  The
purpose and object of these donations is herein set forth; to
wit, " the encouragement of internal improvements."

Texas has near one hundred millions of acres of her public
domain unincumbered by private title.  She has about two
hundred and forty thousand square miles of territory—she has
ten degrees of latitude and nine and a half degrees of longitude;
enough to subsist in comfort the whole people of Continental
Europe—nearly one-half of her territory is uninhabited by civ-
ilized man.   Perhaps no country in the world is more richly
endowed with all the natural elements of wealth and comfort;
but they are undeveloped.

Railroads, wherever they have been constructed, have proved
the readiest means of developing the wealth and natural
resources of the country, contributing in a large degree to the
comfort, civilization, and prosperity of the people.

Had Texas, then, in 1866, no vital, tangible interest in

promoting her internal improvements? Almost as well might it be said that the State has no paramount interest in the endowment of her public schools, and the promotion of universal education—she is interested in all these great enterprises, and no man that lives in the nineteenth century can estimate the moral and physical advantages that are to flow from them as their legitimate and inevitable sequence. If her interest lies in increasing her population, in developing her wealth, in promoting all her social, moral, and commercial interests, then the question is answered and the objection met.

The Congress of the United States, acting under a Constitution not dissimilar to the State Constitution of 1845, has so often granted lands from the public domain in aid of internal improvements, that whilst the policy has been and still is, the power is not, questioned.

The case of Fletcher v. Peck, already referred to, in 6 Cranch, grew out of an exercise of this power on the part of the Legislature of Georgia, and the Supreme Court of the United States did not question the power.

The general government has made grants of lands to the States repeatedly, for different purposes, and these grants have passed under the control of the Legislatures, and have been administered in various ways. Some of the States made reservations of portions of their domain, or received from the general government large grants of lands not lying within their own territorial limits. Virginia reserved a large body of lands in Southern Ohio and in Illinois, which she granted out under bounty warrants to her Continental troops. Connecticut received a large donation of lands in northeastern Ohio, what is known as the Western Reserve, from which she has heretofore, and still does maintain her admirable system of public schools. Ohio, Indiana, Michigan, Illinois, and Iowa, have all received grants of lands from the general government, for purposes of internal improvement; indeed, all the States of the Union, in some form or other, have received these grants for canal, railroad and river improvements, and for the endowment of schools

and colleges, and they have passed immediately under the control and administration of the political power of the several States to which the grants have been made.

But in our own case, by the treaty of annexation, Texas reserved for her own and separate use her public domain. It never has been incumbered by any conditions imposed by the government of the United States, but is left free from any other control than that exercised by the political power of the State.

A rule of construction applied to that clause of the Constitution quoted in this opinion would seem to imply, the objectional acts of the 11th Legislature therein being enumerated, that those not enumerated are to be respected as of binding force. The railroad laws under which plaintiff seeks to make out its right are not classed among those abrogated by this clause of the Constitution.

This reasoning applies to the fifth and eighth causes of demurrer.

The third and fourth causes of demurrer may also be considered together.

It is herein suggested that if the plaintiff did, under its charter and the precedent railroad laws, acquire a right to the certificates for which it sues, that the right has been abrogated by our present Constitution.

Sections 6 and 7, Article 10, of the Constitution of 1869, read as follows:

SECTION VI.—The Legislature shall not hereafter grant lands to any person or persons; nor shall any certificate for land be sold at the Land Office, except to actual settlers upon the same, and in lots not exceeding one hundred and sixty acres.

SECTION VII.—All lands granted to railway companies, which have not been alienated by said companies, in conformity with the terms of their charters respectively, and the laws of the State under which the grants were made, are hereby declared forfeited to the State for the benefit of the School Fund.

The language of the 6th Section clearly indicates to my mind that such grants by the Legislature as are therein inhibited, if

made before the adoption of the Constitution, were regarded by the Convention as valid.

The succeeding section does in terms declare forfeited to the State for the benefit of the School Fund, all lands granted to railway companies which have not been alienated by said companies in conformity with the terms of their charters respectively, and the laws of the State under which the grants were made.

There can be no evasion of this language ; .the purpose of the Convention is clearly defined. Had it the power to consummate this purpose ? If I am right in the conclusion based upon the authorities already referred to, that the plaintiff's charter, after acceptance and compliance with its terms in good faith, became a contract binding on the State and on the plaintiff, then it becomes clear that the 7th Section of the 10th Article of our Constitution is repugnant to Section 10 of Article 1 of the Constitution of the United States. Our Constitution is a law, and no State shall pass any law impairing the obligation of contracts.

And the Act of Congress admitting the State of Texas to representation in the Congress of the United States cannot be regarded as curing this antagonism in our Constitution to that of the United States ; for Congress can clothe no State with power to do that which is inhibited by the Federal Constitution.

Looking at the language of the 33d Section of the 12th Article of our Constitution, I might be led to suppose that the Convention did not intend to set aside grants of land previously made to railroad companies ; but the language of the 7th Section of the 10th Article is too plain and unambiguous to admit of any other construction than that which I have put upon it. And whether the Convention regarded the railroad charters as contracts or not, it was obviously the intention of the Convention to forfeit to the State the lands previously granted and not alienated.

In this view it is scarcely necessary to consider the sixth ground of demurrer. If, under pre-existing laws, the plaintiff had acquired rights in the nature of those secured by contract,

and had yet time within which to build its road at the adoption of the present Constitution, those rights could not be affected, for the reasons already given.  But the plaintiff is not without evidence of good faith.  It organized in its corporate capacity and secured a cash subscription of six millions of dollars from individuals, which it alleges was subscribed upon the faith of the State complying with the terms of its charter and pre-existing laws; thus having overcome the chief obstacles in the way of consummating its enterprise, before the Constitution of 1869 was adopted.

I am not prepared to say how far the plaintiff must have signified its acceptance of the terms of its charter, or what acts would have been sufficient to have fixed the liability of the State; but when I consider that the Legislature had from time to time extended the period within which the railroads of the State were bound to comply with the terms of their charters, and regarding historically the condition of the country from 1861 to 1867, I am not prepared to charge upon the plaintiff a want of good faith, or hold it responsible for such laches as would work a forfeiture of its charter.

The ninth cause of demurrer may be briefly considered. Admitting the fact, as an abstract proposition, that the State of Texas has control of her public lands (and indeed this is an assertion necessary to the correctness of this opinion), yet I think it by no means follows that the State has not contracted with the plaintiff, that upon its compliance with the conditions prescribed in its charter, it shall be entitled to the certificates for which it sues.

The State is not a party to this suit, nor does it appear that she is in any way resisting the plaintiff in the assertion of its rights.  On the other hand, the record shows that his Excellency the Governor and the State engineer have both complied with their duties as prescribed by law, in furtherance of the plaintiff's right.

Certainly it will not be claimed that the State could, in violation of a plain and obvious legal right, assert that, because

she holds the sovereignty of the soil, she would be justified in withholding from individuals the title to lands which she had fairly and honestly contracted away.   The argument, then, which supports the ninth cause of demurrer loses all its moral force ; and its legal sufficiency is not called in question in this case.

The tenth cause of demurrer has been considered in connection with the first.

It but remains for me then to consider the seventh cause of demurrer, upon which the judgment of the District Court is predicated.

I cannot better introduce my own opinion, and the authorities bearing upon this point, than by a somewhat lengthy extract from the opinion of Mr. Justice Davis, delivered in the Binghamton bridge case, 3 Wallace, pages 73, 74.   " As this " court has never grasped at ungranted jurisdiction, so it will " never, we trust, shrink from that which is conferred upon it. " The constitutional right of one Legislature to grant corporate " privileges and franchises, so as to bind and conclude a succeed- "ing one, has been denied.   We have supposed if anything " was settled by an unbroken course of decisions in the Federal " and State Courts, it was that an act of incorporation was a " contract between the State and the stockholders.   All courts "at this day are estopped from questioning the doctrine.   The " security of property rests upon it, and every successful enter- " prise is undertaken in the unshaken belief that it will never " be forsaken.

" A departure from it *now* would involve dangers to society " that cannot be foreseen ; would shock the sense of justice of " the country, unhinge its business interests, and weaken, if not " destroy, that respect which has always been felt for the judi- "cial department of the government.   An attempt even to re- " affirm it could only tend to lessen its force and obligation.   It " received its ablest exposition in the case of Dartmouth Col- " lege *v.* Woodward, which case has ever since been considered "a landmark by the profession, and no court has since disre-

"garded the doctrine that the charters of private corporations
" are contracts, protected from invasion by the Constitution of
" the United States. And it has since so often received the
" solemn sanction of this court, that it would unnecessarily
"lengthen this opinion to refer to the cases, or even enumerate
" them. The principle is supported by reason as well as au-
" thority. It was well remarked by the chief justice, in the
" Dartmouth College case, 'that the objects for which a corpo-
" ' ration is created are universally such as the government
" ' wishes to promote. They are deemed beneficial to the
" ' country, and this benefit constitutes the consideration, and
" ' in most cases the sole consideration, for the grant.'

" The purposes to be attained are generally beyond the abil-
" ity of individual enterprise, and can only be accomplished
" through the aid of associated wealth. This will not be risked,
" unless privileges are given and securities furnished in an act
" of incorporation. The wants of the public are often so im-
" perative that a duty is imposed on the government to provide
" for them ; and as experience has proved that a State should
" not directly attempt to do this, it is necessary to confer on
" others the faculty of doing what the sovereign power is un-
" willing to undertake. The Legislature, therefore, says to the
" public-spirited citizens: If you will embark, with your time,
" money, and skill, in an enterprise which will accommodate
" the public necessities, we will grant to you for a limited
" period, or in perpetuity, privileges that will justify the expen-
" diture of your money and the employment of your time and
" skill. Such a grant is a contract with mutual considerations,
" and justice and good policy alike require that the protection
" of the law should be assured to it.

" It is argued as a reason why courts should not be rigid in
" enforcing the contracts made by States, that legislative bodies
" are often overreached by designing men, and dispose of fran-
" chises with great recklessness. If the knowledge that a con-
" tract made by a State with individuals is equally protected
" from invasion as a contract made between natural persons,

" does not awaken watchfulness and care on the part of law-
" makers, it is difficult to perceive what would. The corrective
" to improvident legislation is not in the courts, but is to be
" found elsewhere."

This very able opinion, together with those which preceded
and followed it, literally leaves no ground for me to occupy in
the discussion, if indeed the question can be considered as open
to discussion.

There was a time when able jurists and statesmen seriously
discussed the question as to whether a legislative body had the
power to tie up and forestall the action of future legislatures.
An instance of this kind is found in the letters of Cicero to
Atticus. Mr. Webster, in his celebrated argument for the
plaintiffs in error, in the Dartmouth College case, introduces an
extract from letter No. 44 of the Federalist, written by Mr.
Madison over the signature of Publius, which is as follows:
" The sober people of America are weary of the fluctuating
" policy which has directed the public councils. They have
" seen with regret and indignation the sudden changes and
" legislative interferences, in cases affecting personal rights, be-
" come jobs in the hands of enterprising and influential specu-
" lators, and snares to the more industrious and less informed
" part of the community. They have seen, too, that one legis-
" lative interference is but the link of a long chain of repeti-
" tions; every subsequent interference being naturally produced
" by the effects of the preceding."

This extract is pregnant with truth and meaning; yet it can-
not be denied that there is great danger to be apprehended
from the influence which colossal moneyed corporations are
now exerting, and may hereafter exert upon the morals of the
country. But as jurists, we may not introduce the discussion
of this matter here; and yet a word of warning may not be
out of place.

In support of the doctrine that a legislative grant is a con-
tract within the meaning of the 10th Section, Article 1 of the
Constitution of the United States, the plaintiff refers us to the

28

following authorities; these, and others which might be cited, I have examined: State Bank of Ohio v. Knoop, 16 Howard, 369, 380; Dodge v. Woolsey, 18 Howard, 331; Trustees of Dartmouth College v. Woodward, 4 Wheaton, 518, 650; Fletcher v. Peck, 6 Cranch, 87; State of New Jersey v. Wilson, 7 Cranch, 164; Planters' Bank of Mississippi v. Sharp, 6 Howard, 301, 327; Gordon v. Appeal Tax Court, and Cheston v. Appeal Tax Court, 3 Howard, 133; Woodruff v. Trapnall, 10 Howard, 190; Jefferson Branch Bank v. Skelly, 1 Black, 436, 449; Bridge Proprietors v. Hoboken Company, 1 Wallace, 116; The Binghamton Bridge, 3 Wallace, 73, 74; Hawthorne v. Califf, 2 Wallace, 10; Van Hoffman v. The City of Quincy, 4 Wallace, 549, 550; McGee v. Mathis, 4 Wallace, 143; Home of the Friendless v. Rouse, 8 Wallace, 430; Railroad Company v. McClure, 10 Wallace, 51.

In the State of Ohio v. The Commercial Bank of Cincinnati, 7 Ohio Reports, 125, the court say: "We take it to be well " settled that the charter of a private corporation is in the na- " ture of a contract between the State and the Corporation." Had there ever been any doubts upon this subject, those doubts must have been removed by the decision of the Supreme Court of the United States in the case of Woodward v. Dartmouth College, 4 Wheaton, 518. " Powers once granted can- " not be revoked; nor can any material change be made in " such act of incorporation, unless by the assent of the corpora- " tion themselves. Hence it is customary in the legislation of " this State to reserve the power of change or alteration, " where it is desirable that such power remain in the State."

In the subsequent Bank cases, reported in 1st Ohio State Reports, the court ventured upon the assertion of a different doctrine; but the cases were carried on error to the Supreme Court of the United States, where they were settled in accordance with the uniform opinions of that court.

In the case of George C. Dodge v. John M. Woolsey, reported in 18 Howard, 331, the case of the Piqua Branch of the State Bank v. Knoop, 16 Howard, 360, is reviewed and affirmed ;

the court had to deal with a question similar in some respects to one of the questions raised by demurrer, in the case at bar.

In 1845, the State of Ohio passed what is called the State Banking law; such banks as organized under this law were to pay the State, in lieu of all taxes, six per cent. upon their dividends, after deducting losses and expenses. In 1851, the people adopted a new Constitution, which provided a different mode of taxation, and in 1852 the Legislature passed an act, directing the property should be taxed in the manner prescribed by the Constitution. This law imposed a more onerous burthen upon the State banks than did the law of 1845. The act of 1852 was sharp and stringent in its character, and was known as the crowbar law. The tax-collectors were authorized under it, to break open the vaults of the banks, and take from them the taxes claimed to be due the State; this they did in some instances, which led to litigation, and the cases were finally adjudicated in the Supreme Court of the United States, where it was held: " The fact that the people of the State had, in 1851, " adopted a new Constitution, in which it was declared that " taxes should be imposed upon banks in the mode which the " act of 1852 purported to carry out, cannot release the State " from the obligations and duties imposed upon it by the Con- " stitution of the United States."

This case is precisely in point, and fully answers the argument that the people of Texas, by the adoption of the Constitution of 1869, could release the State from obligations previously imposed by her railroad charters.

In the case of Crawford v. Bender, decided by this court at last term, on the authority of one case in our own reports, two in New York, and one in Connecticut Reports, we were led to use the following language: " That the people of Texas, " through their Constitutional Convention and at the ballot-box, " in voting upon the adoption of the Constitution, had both the " right and power to disregard even vested rights, if they " deemed it advisable." I deem it due to ourselves, but more especially to the eminent jurists, Justice Lipscomb, Justice De-

nio, and Chief Justice Hosmer, to say that such vested rights as may be thus disregarded by a Constitutional Convention, are only such as are not within the special protection of the Constitution of the United States. But how is a contrary doctrine to be supported in this case? There is but one possible ground upon which it can rest. Hence it is assumed that the several acts of legislation under which the plaintiff claims its franchise and its right to the land in question are all void *ab initio*.

Can this court fall back on such a doctrine? Have we not given force and sanction to the acts of the several Legislatures by which these laws were passed?

Numerous decisions attest the fact that we have adjudicated the right both to liberty and property as fixed and regulated by these laws, and heretofore no member of this court has been understood to entertain a doubt or scruple of our right and duty so to do. Why hesitate now? Why fall into the *ab initio* theory, as so called? Can this theory maintain itself in reason, logic, or law? No member of this court will now deny that some of the acts of the Legislature of 1866 are valid and binding. What acts? We must recur to the old formula, " Such " as were not passed in aid of rebellion," &c., &c.

Do the several acts under which the plaintiff claims the writ of *mandamus* come within the category? Were they passed in aid of rebellion? Are they to reward disloyal citizens? Do they make distinctions on account of race or color? A child may answer all these questions. Shall we insist that a railroad company, chartered by the laws of the State, is not entitled to the same rights that a natural person would have under like conditions and circumstances? I cannot conceive that were this a case between A B and C D, we should hesitate a moment to hold the plaintiff entitled to the writ; and if we did hold otherwise, we must certainly overrule many of our former decisions.

OGDEN, J. Not being able to agree with the majority of the court in the decision of this case, I feel it due, not only to this

court but to myself, to state briefly the grounds of my dissent. The magnitude of the case, involving, in its determination, vast interests for the distant future of the State, demands a careful consideration of every question legitimately presented by the record, and is a sufficient apology for the expression of an individual opinion in regard to the legal principles which determine the rights of the parties.

As the question of jurisdiction presented by defendant's demurrer in the court below, was undecided in terms by that court, and as the appeal from the judgment of the lower court, and the assignment of errors, raise no question of jurisdiction, it is deemed unnecessary to notice that question for a proper determination of the cause, as presented by the record. Again, there is no attempt by these proceedings to question the corporate capacity of appellant, or to take away or abrogate any authority it may have had by reason of its charter. It is therefore deemed unnecessary, in order to a legal disposition of the case, to decide the question of the legal existence of appellant as a corporation. For the purpose of deciding this case it may be conceded that appellant is to all intents and purposes a corporation possessing a good and valid charter, granting and securing to it important rights and franchises, which are irrepealable and absolute so long as they comply with the terms of the charter. The question for decision in this case is not as to the validity of the charter creating the company, but as to the validity of a grant of land claimed to have been made by the State of Texas for the encouragement of the construction of railroads in Texas, and under which grant appellant claims a large quantity of land.

In January, 1854, the Legislature of the State of Texas passed an act granting to any railroad company constructing a section of twenty-five miles of road, sixteen sections of land for every mile of road so constructed; and by a supplemental act of the same date it is provided that "no road benefited by this " act, or the act to which this is a supplement, shall receive any " donation of land under its charter, or under the act to which

" this is a supplement, for any work not completed within ten " years after the passage of this act."

This latter or supplemental act clearly demonstrates the intent and wisdom of the Legislature in encouraging railroad companies to push forward the construction of their roads with all possible dispatch, that the State might have the benefit of the constructed roads which had received land donations, in peopling the State and developing the resources of the country; and the grant might then have been considered as a compensation for the additional expense which would attend a rapid construction and completion of railroads.

In January, 1862, during the existence of the rebellion, the Legislature, assembled under the authority of the so-called Confederate States, passed an act extending the provisions of the act of 1854 until two years after the close of the war between the Confederate States and the United States of America. The chief and almost only object of this latter act, was to withdraw all the resources and energy of the country from the construction of roads and other improvements, and to apply the same to the prosecution of the war of rebellion. It is true that it was then difficult to procure the materials for constructing roads, and contractors might have suffered, but it is a notorious fact that at that time there was but little legislation for the benefit of corporations or persons, and if the object of the act had been to benefit railroad companies, it would have been of equal force and benefit if passed after the close of the war.

The act of 1854 expired by its own express terms in 1864, unless the act of 1862 extended the same until two years after the close of the war. And it is believed that here is presented an important inquiry, in order to the proper determination of this cause, since, if the statute of 1854 had expired by its own limitation, it then becomes a dead letter in the statute book, and could be revived only by a re-enactment of all its terms, conditions, and restrictions.

It is believed to be one of the fundamental principles of law, recognized by the highest authority, that an insurrectionary or

rebellious province, or State, can make no laws which *proprio vigore* can have any binding force or authority, any longer than the physical force of the rebellion or insurrection exists; and especially can it not make any law, or enter into any contract, which shall be binding upon the legitimate sovereignty so soon as the rebellion is put down. (Halleck's International Law, 825 *et seq.*)   This is peculiarly the case where an attempt has been made to encumber or dispose of the public domain, or any portion thereof.   A rebel or insurrectionary government has no title to the public domain.   It may possess and use during the continuance of its belligerent power any portion of public lands, but has no right to alienate until the rebellion has proved successful. (Halleck's International Law, 77, 122, 447.)   Again, on page 448, Mr. Halleck says that " the purchaser of any por-" tion of the national domain of a conquered country, takes " the risk of being evicted by the original sovereign owner, if " he should be restored to the possession of his domains."   If these are correct principles of international law, then the Con-federate State of Texas had no power or authority during the rebellion to alienate, by grant or otherwise, any portion of the public domain, nor to pass any law in regard to the same, that could have any binding force or validity after the rebellion had been put down by the legitimate government.   Indeed, it is claimed with much force by counsel in the case of The State *v.* White & Chiles, 25 Texas Supplement, 465, in regard to all laws passed by a rebel Legislature, that " the only rule upon " which the courts of a restored power can act with safety, is to " limit the validity of the acts of the usurping government to " the absolute necessities of society; and even in regard to such " acts, and certainly as to all others, to exercise a sound judicial " discretion."   And Chief Justice Chase, in delivering the opinion in that case, announced a similar rule by saying " that " acts necessary to the peace and good order among citizens " must be regarded in general as valid, when proceeding from " an actual, though unlawful government, and acts in further-" ance or support of the rebellion, or intended to defeat the

· " just rights of citizens, and others of a like nature, must in " general be regarded as invalid and void."

The act of 1862 most certainly was not passed for the preservation of peace and good order of society, but for the purpose of guaranteeing to private corporations—which had in many instances forfeited their charters in attempting to speculate off from the necessities of the people—a very large proportion of the public domain ; and it is believed that there is no responsible published authority to be found, supporting the validity of that or any other similar law passed under like circumstances. Again, the act of 1862 was passed in recognition and in aid of the rebellion, and therefore " must be regarded without validity and " void " (The State v. White & Childs, 25 Texas Supplement, 608) ; and like the stay laws of 1861, 1862, and 1863 (which suspends the collection of debts until two years after the close of the war), with which it bears a strong analogy in spirit and many of its provisions, it is " in spirit and purpose contrary to " public policy, in aid of the rebellion, and was and is there- " fore void." (Sequestration cases, 30 Texas, 707.) If, therefore, the act of 1862, extending the time for railroads to complete their work in order to be entitled to grants from the public domain, was void for the want of legitimate authority to pass such an act, and also because the same was a recognition of, and in support of the rebellion, then the act of 1854, granting land to railroads, expired by its terms in 1864, and on the 22d of October, 1866, when appellant's charter was passed, there was no general or special law of the State in force, granting lands to railroads, and a simple charter, creating a corporation with certain rights, franchises, and privileges, was the only grant they received.

But it is contended that the act of the 13th of November, 1866, extended the grants made by the act of 1854, for ten years from the passage of the latter act. This it is believed could not be done as attempted ; for, if the law of 1854 had expired, then it could not become a law, or be extended as such, without going through all the formula of a re-enactment. And

if the law of 1854 were in full force, then the act of 1866 would be plainly obnoxious to the constitutional requirement that no law should be revised or amended by reference to its title, but that in such a case, the act revised, or the section amended, should be re-enacted and published at length. And again, the act of November 13th, 1866, is so uncertain and indefinite in its terms that it is believed no judicial construction or interpretation can properly be given it, and that therefore the same should be declared void for uncertainty, if for no other reason. But should this act be held valid at the time of its passage, it was simply an act making a naked donation, and no part of the contract embraced in the charter, if such a contract ever existed. This act was subsequent to, and independent of the charter, and if appellant by that latter act received a grant of land at all, it was as a simple gift without consideration. But this act was passed by a provisional Legislature called into being by the authority of the National Executive alone, by virtue of his power as commander-in-chief of the army. That Legislature, without any constitutional recognition or legitimate authority, was emphatically what Congress styled it, "provisional only," and its authority was limited to providing for the immediate necessities of the people, and also to prepare for the formation of a permanent, loyal, and constitutional government.

The act of Congress of March 2d, 1867, but a few months after the passage of the act under which appellant claims, declared that there was no legal State government in Texas, and therefore provided for the enforcement of peace and good order in the State, until a loyal and republican government could be legally established. And in July of the same year Congress, for fear that the act of March might not be fully understood, passed a supplemental act, declaring that the governments then existing in the ten named rebel States, including Texas, were not legal State governments, and that if they were continued at all, they must be subject in all respects to the military commanders. And yet it is from this rebel government, and un-

constitutional and illegal Legislature, that appellant claims an exclusive franchise from the people of Texas, to continue for fifty years, and a donation of hundreds of thousands of acres of the public domain.

It is said that the governments of Texas existing in 1866 and 1867 have been recognized by every department of national and State governments since that time, and therefore the courts now should sustain this princely grant, as binding upon the State and people.   It is true that the existence of a government, or rather a provisional government, may have been recognized as a fact, the same as the war of 1861, 1862, and 1863 was recognized.   But it may be most emphatically denied that any department of either State or National government has ever recognized the State government of 1866, or the Legislature which created the appellant a corporation, as a legitimate government, or Legislature, or as having any other than a provisional authority for a temporary purpose, and no power whatever to bind the State or people against their will, one hour longer than that provisional government existed.   The Legislature of 1866 being therefore an illegal body, it was clearly without authority to make any legal or binding contract with appellant, or other persons, which the people would be bound to respect or the courts to execute, and especially if that contract was made to be executed in the future, when their temporary authority shall have ceased.

Again, appellant claims the performance of a contract for the grant of land.   Halleck's International Law, 447, 781, says that a *de facto* government may make or change any law at pleasure, but that such changes end with the power which made them, and that any *de facto* government may use, but have no power of alienation over the public domain.   The government and Legislature of 1866 was provisional only ; its authority was limited to the present necessities of the people ; and that authority, as well as the binding effect of the same, must of necessity cease with that limited and temporary government. There was, then, no power in that Legislature to alien or grant

land, or to make any binding contract in regard to the same. It is therefore contended that appellant has no binding contract with the State, for the reason that the parties had no legal authority to make such a contract, and that they had no right to contract for the grant of land belonging to the State, to be binding in the future.

Again, the State government of 1866 was organized under the Constitution of that year, and the Legislature which attempted to make a donation to appellant acted under and by virtue of the authority of that Constitution alone; yet that Constitution was wholly rejected by Congress, and its authority as a Constitution denied to the State.

The State government was finally displaced on account of its disloyal and illegal character, and the people again authorized to form another Constitution, for the better protection of all the people and the greater security of republican institutions. The Constitution of 1869 was formed by a Convention of the people, was accepted by Congress, and finally adopted by a vote of the people, and became the fundamental law of the State. That the Convention which formed the present Constitution had full power and authority to declare every legislative act since the passage of the ordinance of secession, null and void, there can now be no doubt. The right of secession may at one time have been considered an open and debatable question, but that question with all its attendant sequences has been submitted to the arbitrament of war, and so far as this country is concerned has been definitely settled, and it is now believed to be but folly to contend for the right of secession, or the right of seceding States to make laws, or even contracts, which shall be binding upon the State and people in the future.

It is true that there may be acts relating exclusively to the preservation of society, and the regulation of the municipal affairs of the State, which should be respected, not because of the right of a rebellious body to pass such acts, nor because of any intrinsic force in the acts when once passed, to become binding upon the State, but simply because their observance would

be more beneficial to the people than their abrogation; and the power of the Constitution to declare all laws made by an illegal government null and void, may and must remain unquestioned.

We have, then, only to inquire whether the present Constitution has in any manner, either directly or indirectly, repealed or annulled the act of 1866 under which appellant claims, in order to a final and legitimate settlement of the rights of the parties. Article 12, Section 33, of the present Constitution, declares the ordinance of secession, and all laws and parts of laws founded upon said ordinance, null and void from their passage, and that the Legislature which sat in the State from 1861 to 1866 had no constitutional authority to make laws binding upon the people. This clause declares directly that the statute of 1862, extending the time for railroads to complete their work until two years after the close of the war, is null and void, as that was clearly a recognition and in aid of the rebellion.

The latter clause of the same section of the Constitution declares " that the Legislature of August 6th, 1866, was provis-" ional only, and its acts are to be respected only so far as they " were not in violation of the Constitution and laws of the " United States, or were not intended to reward those who par-" ticipated in the late rebellion, or to discriminate between citi-" zens on account of race or color, or to operate prejudically to " any class of citizens." It is claimed for appellant that this clause validates all the laws of 1866, excepting those specially excepted. This certainly cannot be a fair philological construction of the language used; on the contrary, it intends to declare certain laws null absolutely, and to leave the remainder to be respected or not as the Convention or Legislature might think proper, but it does not declare that any one law shall remain in force or be respected. But it may be admitted that this clause of the Constitution would leave the act of 1866, under which appellant claims, in full force, if indeed it was ever in force, but this certainly could not prohibit the Convention, in another clause of the Constitution, from directly or by

implication declaring that act void.    Sections 2, 3, and 4, of Article 10, were incorporated in the Constitution, evidently as preliminary provisions to a special dedication of all the undisposed of public domain, and to make a definite ascertainment of the same, on or before the 1st day of January, 1875.    But if appellant's claim be sustained, it will certainly defeat the object of the three sections referred to, as it would then be impossible to ascertain the quantity of the public land remaining undisposed of until 1877 ; as their claim, if valid, may run until that time.    It is therefore believed that these sections of the Constitution show a clear intent to hereafter disregard all claims for grants of land to railroads.

Section 5 of the same article declares that all lands heretofore reserved for the benefit of railroads, shall hereafter be subject to location by any genuine certificate ; clearly indicating a determined purpose to withdraw the many lavish grants and privileges which had been given to corporations, with the expectation that they would be used in the development of the resources of the State, but which had in most instances failed in accomplishing the object intended.    Section 6, Article 10, prohibits the Legislature from hereafter granting lands to any person or persons.    There can be no mistaking the language here used, and no doubt that all legislative grants of every character are prohibited.    It may be claimed that "person or per-" "sons" does not include corporations.    This doubt, or rather quibble, may be answered by the inquiry of what a corporation is composed if not of "person or persons ?"    And further, who are to be beneficiaries of the grant to a corporation, if not a "person or persons ?"    But the authorities are abundant and clear on that question.    Angel & Ames, on Corporations, page 3, says, "A corporation is said to be a person for certain pur-" "poses, and the construction is that when persons are mentioned "in the statute, corporations are included."    (2 Kent, 215 ; 2 Black. Com., 37.)    It may be contended that the Convention only intended to place this prohibition upon future legislation, but it would be a little surprising that a loyal Convention would

prohibit future loyal Legislatures from granting lands, and, by its silence, in the same article sanction and revive grants not binding on the people or State, and made by rebel and illegal Legislatures.

But it is believed that Section 7 of the same article was intended to settle, and does settle all question, and all possible doubt in the matter. It provides that, "All lands granted to "railway companies, which have not been alienated by said "companies in conformity with the terms of their charters re- "spectively, and the laws of the State under which the grants "were made, are hereby declared forfeited to the State for the "benefit of the school fund." If there could be any doubt as to the proper construction of this section, the history of the Convention, and its purposes and intents in that particular, are too well known to leave any doubt in regard to the matter. But it is believed that a proper construction of this section is not difficult, and that it has but one meaning, which is simply that all grants and donations, whether in certificates or legislative grants, and which have not been alienated, are declared forfeited. Here is believed to be a most emphatic declaration that all legislation since the commencement of the war, in relation to the grants of land, are null and void ; and this of course would include the acts of 1862 and 1866, under which the appellant claims.

Section 6, Article 9, of the Constitution would seem to be a treble confirmation of the view of the Constitution here taken, since that is a solemn dedication of all the public domain to the support of the public schools of the State. This clause would become a farce, and the act of dedication worse than folly, if the statute of 1866 is declared binding upon the State; since the decision in this case will open the door for the claims of almost numberless dead and dormant companies, whose voracious maws are now gaping to swallow up the last acre of all that is valuable of our undisposed-of public lands. It is, however, claimed that appellant is not a dormant corporation, but that it has been very active and energetic in pushing

forward its work to a final completion, and in extending to the people great facilities, which must result in the pecuniary and physical advancement of the best interests of the State ; and while this and even more may be admitted, to the lasting credit of the company, yet it is believed that the courts are not warranted in making exceptions on account of merit, against the law.

Again, the statute of 1854, which appellant claims to have been extended in 1862 and 1866, restricts the donation of land to such companies as shall have completed twenty-five miles of road within two years from the passage of that act, and expressly provides that, " Such donations shall be discontinued " in every case where the company or companies shall not con- " struct and complete at least twenty-five miles of road contem- " plated by their charter, each and every year." The charter in this case was passed in 1866, but it is admitted that up to 1870 (nearly four years), and a year after the adoption of the present Constitution, no part of the road had been completed. Of course, then, if appellant ever had any just claim to any portion of the public domain, that claim had wholly ceased, and the constitutional prohibition clearly attached to it, as well as all other companies ; and should it be claimed for appellant that the disturbed condition of the country between 1866 and 1870 was such that capitalists would not risk an investment in this State, and that therefore that time should not be counted against it, it may be answered that Constitutions and laws were never intended to yield to the caprice or interest of capitalists. And besides, when appellant sought and obtained a charter, the condition of the country was as much disturbed, and as well known to be so, as at any subsequent period ; and therefore appellant, in asking a charter at that time, with all the limitations and restrictions, tacitly agreed to abide by the terms, and take the risk, and therefore is not now entitled to any consideration in law or equity because of its failure to perform its contract ; and the constitutional Convention was fully authorized on this account in declaring the donation, if one ever existed, null and void.

For the reasons herein contained, I am of the opinion that there was no error in the judgment of the District Court in sustaining the demurrer of appellee, on the ground that there was no binding contract between the parties which should be enforced by the courts, and that the judgment should be affirmed.

(*Reporter's Note.*—In conformity to the opinions of the majority of the court, judgment was entered remanding this cause to the District Court. But, at a subsequent day of the term, the Commissioner, in view of the fact that the merits of the case had been fully presented and adjudicated, and in order that the State might not be subjected to further and unnecessary costs, submitted to such final judgment as this court might render ; and thereupon final judgment was rendered in favor of the appellant, awarding a peremptory *mandamus* according to the prayer of the petition.)

Reversed and rendered.